Alfred AVINS, Appellant in No. 79–1747,

v.

James P. WHITE, Appellant in No. 79–1748.

Nos. 79–1747, 79–1748.

United States Court of Appeals, Third Circuit.

Argued March 24, 1980.

Decided June 30, 1980.

F. Alton Tybout (argued), John A. Elzufon, Tybout, Redfearn, Casarino & Pell, Wilmington, Del., for appellant, cross-appellee.

Alfred Avins, pro se.

Leonard S. Janofsky, President, American Bar Association, Chicago, Ill., David W. Robertson, Mandell & Wright, Houston, Tex., on Behalf of the American Bar Association as amicus curiae.

Willard H. Pedrick, Professor of Law, Tempe, Ariz., W. Page Keeton, Austin, Tex., on Behalf of The Association of American Law Schools, The American Council on Education, and The Council on Postsecondary Accreditation as amici curiae.

Before ROSENN, GARTH and SLOVITER, Circuit Judges.

OPINION OF THE COURT

ROSENN, Circuit Judge.

This appeal in a diversity action presents important questions of defamation law arising out of the accreditation process of a private law school. It arises out of a controversy which had its genesis in the intense conflict surrounding the struggle of Delaware Law School (DLS) and its founder and first dean, Alfred Avins, to secure provisional accreditation by the American Bar Association (ABA) so that the school's first graduating class would be eligible for the state bar examinations. Avins charged that James P. White, serving his first assignment as a consultant for and a member of the ABA accreditation team, in the course of evaluating DLS, made defamatory statements which eventually resulted in Avins losing his position as dean and faculty member of the law school. The jury agreed and awarded Avins $50,000 in compensatory damages. We reverse and remand for a new trial.

I.

In an effort to maintain minimum standards for faculty, facilities, and programs, and to protect students, the public, and the legal profession from substandard law schools, the ABA maintains a Council of the Section of Legal Education and Admissions (Council) and an Accreditation Committee. The Council and Committee carry responsibility for inspecting law schools and recommending to the ABA House of Delegates those law schools eligible for accreditation. In recent years, almost all states have delegated the accreditation responsibility for law schools to the American Bar Association.

Plaintiff, Alfred Avins, possessed an impressive academic background with numerous advanced degrees and many legal publications to his credit. In 1971, he became the founder and progenitor of DLS. DLS was established as a purely private and independent law school, financially dependent for its operations on student tuition. It was able to attract a substantial student body composed principally of students who had been unsuccessful at securing entrance to an accredited law school.

ABA accreditation is critical to the existence of any law school for without it graduates in most states do not have access to the official state bar examination. Provisional approval is granted by the ABA House of Delegates which ordinarily accepts the recommendation of the Council and its Accreditation Committee. The Council and Accreditation Committee act on reports of teams who inspect applying schools. The inspection reports are treated confidentially and are distributed only to the applicant's dean and the members of the Council and Accreditation Committee. The administrative duties of the Council are carried out by a consultant who, in this instance, was the defendant White. The present suit arose out of four ABA accreditation inspections of DLS. On November 12, 1973, Avins requested an ABA accreditation inspection which was conducted in January 1974. The on-site inspection team consisting of White and Professor Millar Rudd, the outgoing consultant, visited DLS and did not recommend accreditation. Instead, they issued a report, a summary of which stated:

[T]he most important deficiency is an intangible one; there is an academic ennui that pervades the institution. The intellectual spark is missing in the faculty and students.

At the request of DLS, the ABA conducted a second accreditation inspection in May 1974. Defendant White was *not* a member of this inspection team and did not participate in its report. During this inspection, an inspector criticized the school library because it did not contain the United States

Code Service. That night DLS obtained a set of the Service and had it stacked in the library by the next morning. The ABA Accreditation Committee and Council met in July 1974 which was attended by Avins. He addressed both bodies. Provisional approval was again denied and the Council adopted a resolution that DLS was not making satisfactory progress under its present administration.

Early in the spring of 1974, a group of concerned parents of DLS students formed a committee to assist DLS in its accreditation problems. When accreditation was denied for a second time, Judge DiBona, a member of the parents' organization, volunteered to attend the ABA Council's August meeting in Hawaii to find a solution to the school's dilemma. He left armed with a DLS Board of Trustees' resolution establishing three committees to improve DLS. In Hawaii, Judge DiBona presented the resolution to White and learned that Avins' position as dean was a major stumbling block to accreditation. Judge DiBona conveyed this information to Avins upon his return.

Avins thereupon invited White to a DLS Board of Trustees' meeting to be held on August 23, 1974, in Wilmington, Delaware. However, the Board meeting did not eventuate, but Avins, Assistant Dean John Tovey, Judge DiBona, and White went to lunch. At lunch a broad discussion of DLS problems ensued, including a discussion of the book incident of the past May. White allegedly accused Avins of intentionally misleading the Accreditation Committee by falsely representing that the Code Service had been in the DLS library from the inception of the inspection.

Apparently, with the beginning of the new school year, pressures began to mount because of the failure to obtain accreditation. In Avins' words, the "student body became so unmanageable and DLS became so destabilized" that he retired as dean on September 8, 1974. However, he continued as a tenured member of the faculty. DLS thereupon appointed Arthur Weeks as its dean.

The Accreditation Committee conducted a third inspection in January 1975. White was a member of this team. This team also issued a critical report unfavorable to accreditation, although it noted some progress.

> The team feels that the Board would be strengthened by the appointment of an experienced, recognized and respected legal educator. . . . The inspectors believe that the quality of instruction ranges from barely competent to good.

DLS' continued unaccredited status caused panic among its students scheduled to graduate in June 1975. Threats were made against Avins and his car was vandalized.

The new dean of DLS, Weeks, proposed that DLS become affiliated with Widener College. A decision was made on April 12, 1975, to affiliate. In 1976 Dean Weeks filed a set of grievances against Avins and the Widener Board of Trustees voted to dismiss him as a tenured faculty member. He was dismissed on April 20, 1978. White had nothing to do with the grievance committee hearing or Widener's decision to dismiss Avins.

Avins thereupon filed suit against White in Delaware Superior Court for (1) defamation, (2) interference with advantageous relations, and (3) intentional infliction of emotional distress. The defamation charged was based on (1) the first ABA report, (2) the third ABA report, and (3) White's remarks over the book incident at the August 23, 1974, luncheon. On White's application, the case was removed to the United States District Court for the District of Delaware.

A three-week jury trial ensued. White's motions for a directed verdict were denied. The defamation claims were submitted to the jury with the burden of proof set as a "preponderance of the evidence." No special interrogatories were requested or sent to the jury on the defamation counts. The jury found for Avins on the defamation claims and awarded $50,000 in compensatory damages. The jury returned a verdict for White on the other two claims. White appeals from the jury verdict on defamation and Avins appeals from the adverse

jury verdict on tortious interference. The intentional infliction of emotional distress claim is not pressed on appeal.

## II.

We note initially that Delaware law governs the substantive law in this diversity case. Our first task, therefore, is to determine how Delaware courts would resolve the substantive issues presented by this appeal. *See, e. g., Steaks Unlimited, Inc. v. Deaner,* 623 F.2d 264 (3d Cir. 1980). Because a determination of the state law issues may be dispositive and relieve the necessity for examining constitutional issues, we turn to Delaware's law on the substantive issues.

Defamation is defined in the Restatement (Second) of Torts § 559 (1977):

> A communication is defamatory if it tends to harm the reputation of another so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.

Delaware has essentially followed this definition. *See Spence v. Funk,* 396 A.2d 967, 969 (Del.1978). *See also Klein v. Sunbeam Corp.,* 8 Terry 526, 47 Del. 526, 94 A.2d 385, 390 (1952), *Snavely v. Booth,* 6 W. W. Harr. 378, 36 Del. 378, 176 A. 649, 654 (1935). White's central argument on appeal is that the defamation claims should not have been sent to the jury because the alleged defamatory statements were not false statements of fact but rather were non-actionable opinions. No Delaware cases have been cited to us and our research has not uncovered any dealing with the actionability of opinions as defamation. We must therefore predict what rule Delaware courts would follow.

The Restatement (Second) of Torts § 566 (1977) provides:

> A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.

This principle, making expressions of pure opinion non-actionable as defamation, is grounded on the theory that ideas themselves cannot be false. In *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974), the Court, in dicta, stated:

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.

*See Buckley v. Littell,* 539 F.2d 882, 893 (2d Cir. 1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977) (use of "fascist," "fellow traveler" and "radical right" as political labels cannot be regarded as statements of fact).

■ Although Delaware courts have not had occasion to consider section 566 of the Restatement (Second) of Torts, they have cited the Restatement with approval in libel cases dealing with the defense of conditional privilege. *See Burr v. Atlantic Aviation Corp.,* 348 A.2d 179, 181 (Del.1975) (citing with approval Restatement of Torts § 619); *Short v. News-Journal Co.,* 8 Storey 592, 58 Del. 592, 212 A.2d 718, 722 (1965) (citing with approval § 611 of Restatement of Torts); *Pierce v. Burns,* 5 Storey 166, 55 Del. 166, 185 A.2d 477, 479 (1962) (citing with approval Restatement of Torts § 593). We therefore predict that Delaware would also follow Restatement § 566 in determining the actionability of opinions as defamation. Avins' defamation claim was based on three separate statements made by White. We must first examine each of these statements to determine if they contain any actionable defamatory material.

■ The first alleged defamatory statement by White was the summary evaluation of the problems at DLS in the first accreditation report:

> [T]he most important deficiency is an intangible one; there is an academic ennui that pervades the institution. The intellectual spark is missing in the faculty and the students.

Even a cursory glance at this statement reveals its character as pure opinion. The district court apparently allowed this state-

ment to go to the jury because no facts were recited as a basis for the opinion and thus the jury could consider the statement as an opinion based on undisclosed defamatory facts. We perceive no such undisclosed facts. The statement itself is prefaced by the qualification that it is an "intangible" criterion. The use of words like "academic ennui" or lack of "intellectual spark" connote to us no more than a subjective opinion of the educational atmosphere pervading DLS. As such, they more closely approximate a critic's review of an institution rather than a particular individual and are not factual statements disguised in opinion form. Even if the statements were critical of Avins and disparaged his performance "they do not rise (or fall) to that level which would 'lower [him] . . . in the estimation of the community or deter third persons from associating or dealing with him.' The Restatement of the Law, Torts § 559; nor do they injure reputation in the popular sense." *Andres v. Williams*, 405 A.2d 121, 122 (Del.1979). We therefore hold that it was error under Delaware law to allow the summary in the first accreditation report to be submitted to the jury.

Avins' second claim of defamation against White centered on the following statements in the third accreditation report:

The team feels that the Board would be strengthened by the appointment of an experienced, recognized, and respected legal educator. . . . The inspectors believe that the quality of instruction ranges from barely competent to good.

Avins charged that these statements falsely implied that (1) he was not an experienced, recognized and respected legal educator and (2) he was an inferior teacher, although his scholarly acumen was well-known in the legal academic community.

■ We note first that neither of the challenged statements specifically refers to Avins. Under Delaware law, however, it is not necessary for the alleged defamatory statement to refer specifically to the plaintiff before it is actionable. In *Klein v. Sunbeam Corp., supra*, 94 A.2d at 394, the Delaware Supreme Court stated:

[I]t is not necessary that the individual defamed in writing need be positively identified in the defamatory language itself, for it seems clear that defamatory language may be made applicable to the plaintiff by extraneous evidence showing that the plaintiff was intended to be referred to by the maker and was understood to be referred to by the reader.

It is necessary for us to examine, therefore, the statements in the third accreditation report to determine whether they were intended by the accreditation team to refer to Avins and whether a reader of the report would so conclude.

■ We have no difficulty in concluding as a matter of law that the statement regarding teaching quality could not have been intended to or understood as defaming Avins' teaching ability. The evidence reveals that the Avins' classes were not observed and the report itself stated: "Dean Avins is reputed to be a strong and vigorous teacher." It is evident that the report's evaluation of teaching quality at DLS was directed to faculty members other than Avins. We therefore conclude that this statement cannot be considered defamatory and it too should not have been submitted to the jury.

■ Similarly, when the report's recommendation concerning appointment of an experienced, recognized and respected legal educator to the DLS Board of Trustees is read in context, no defamatory reference to Avins may be fairly implied. The report reads:

The inspectors are concerned that the Board, together with the dean and faculty, have not yet defined clear objectives and goals for the institution. The inspectors applaud the selection of several Delaware attorneys as members of the Board. The team feels that the Board needs additional representatives to give it a variety of educational and philosophic points of view. The team feels that the Board would be strengthened by the appoint-

ment of an experienced, recognized and respected legal educator.

The district court allowed the last sentence of the report to be considered by the jury as defamatory because it might imply that Avins was not a respected legal educator and that on the underlying facts Avins was not respected by his peers. We, however, see no extrinsic evidence indicating that the statement was intended to impugn Avins' or any DLS Board member's qualifications. The recommendation is directed to the appointment of an additional Board member and his qualifications. Because of Avins' emotional involvement and close identification with the founding of the school, he attributed virtually any criticism of the school as personal defamation. Such speculative inferences fall short of the extrinsic evidence needed to establish the intent of the report as defamatory and the defamatory effect it might have on the reader. We therefore hold that it was error for the district court to allow the third accreditation report to be submitted to the jury. Because we perceive no defamatory reference to Avins, it is unnecessary for us to consider whether the statements in the third report were actionable as opinion based on underlying undisclosed facts.[1]

The third alleged defamatory statement by White was his remarks to Avins at the August luncheon concerning the overnight effort to cure the library deficiency noted in the second ABA inspection. The gist of Avins' complaint is that White falsely accused him of misrepresentation in the presence of Judge DiBona, whose estimation of Avins was subsequently diminished and ultimately resulted in Avins' relinquishment of the DLS deanship. An exact statement of White's remarks at the luncheon was not available, but Judge DiBona testified that the exchange between White and Avins went as follows:

*White:*

What you did with those books was a horrible thing to have done. We have learned that that ·night, after you had spoken to the librarian, you then sent some students down to Washington to get these books and snuck them in the library during the night and then in the morning, represented to us that they had been in the library  .  .  . .

*Avins:*

It was a matter of bad judgment on my part.

*White:*

It is a lot worse than bad judgment.

On the basis on Judge DiBona's testimony. White's comment impugning Avins' judgment or representation to the inspection team of the nighttime book purchase may have been potentially defamatory. Avins claimed that he had informed the inspection team of the purchase to cure the deficiency in the set of law books on the required list. Thus, White's sharp criticism might have been based on false or erroneous information and the submission of this issue to a jury to determine whether it was defamatory ordinarily would not have been improper.

White, however, contends that he should have received a directed verdict because of his defense of qualified privilege to the luncheon defamation charge. He contends that he had a qualified privilege to voice his views on the book incident and that this

1. The amici curiae, American Bar Association, The Association of American Law Schools, the American Council on Education, and the Council on Postsecondary Accreditation, argue that even if the comments in the accreditation reports were defamatory, White was nevertheless entitled to. a directed verdict. They assert that no question is raised concerning the honesty and regularity of the procedures. They claim that the very nature of the accreditation process is to invite critical opinion. Expression's of qualitative judgment of the faculty and student performance, of administration and curriculum, even though they may be sharp or hard, must be privileged if the process is to be effective and meaningful. Although these contentions may be persuasive and fully consistent with Delaware law, *cf. Burr v. Atlantic Aviation Corp.*, 348 A.2d 179 (Del. 1975) (qualified privilege exists in employer-employee communications), we do not reach them in view of our conclusion that the statements are not defamatory.

privilege was not abused by his comments in Judge DiBona's presence.[2]

The common law recognized that a conditional privilege to publish defamatory statements existed in a variety of contexts. The Restatement (Second) of Torts § 596 (1977) provides: "An occasion makes a publication conditionally privileged if the circumstances lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that there is information that another sharing the common interest is entitled to know." *See* L. Eldredge, The Law of Defamation § 87 (1978). The Supreme Court of Delaware in *Pierce v. Burns, supra*, 185 A.2d at 479, recognized the existence of such a qualified privilege. In *Burr v. Atlantic Aviation Corp., supra*, 348 A.2d at 181, the court held:

A qualified privilege must be exercised with good faith without malice and absent any knowledge of falsity or desire to cause harm.

The question whether a conditional privilege has been abused by malice or intent to harm ordinarily is a factual question for the jury . . . unless . . . the evidence when considered in a light most favorable to plaintiff is insufficient to raise a factual question upon which reasonable men might differ.

■ Avins does not dispute that White possessed a qualified privilege to speak on matters germane to DLS' accreditation. He does claim that White's remarks about the overnight book purchase were outside the legitimate scope of those individuals to whom the information should be communicated. Specifically, he contends that because Judge DiBona was not a member of the DLS Board of Trustees and was only informally connected with DLS, White's remarks in his presence constituted "overpublication" and an abuse of the qualified

privilege. A conditional privilege may be defeated by a showing of excessive publication. The Restatement (Second) of Torts § 604 provides:

One who, upon an occasion giving rise to a conditional privilege for the publication of defamatory matter to a particular person or persons, knowingly publishes the matter to a person to whom its publication is not otherwise privileged, abuses the privilege unless he reasonably believes that the publication is a proper means of communicating the defamatory matter to the person to whom its publication is privileged.

*See* L. Eldredge, *supra*, § 93(g). The district court ruled that the jury could find "overpublication" because White discussed with Avins and Tovey at lunch accreditation matters while DiBona was present.

■ White argues that he had a "reasonable belief" that he could discuss accreditation matters at the luncheon in DiBona's presence, at least while Avins was present, because DiBona had actively spearheaded the parents' organization's role in aiding DLS in its struggle for accreditation. He claims, although the record is not clear on this point, that Avins had arranged the luncheon in substitution for the trustees' meeting to which he had invited White. We believe, however, that on this record whether White reasonably believed he could talk freely in DiBona's presence was a factual matter for the jury to decide. The trial judge properly instructed the jury that

[i]f Mr. White reasonably believed he was authorized to speak before someone in Judge DiBona's position, there was no abuse of the privilege by overpublication.

The jury quite properly could have rejected the defense of qualified privilege and we cannot say that the evidence establishes as a matter of law, *Burr, supra*, that White did not abuse his qualified privilege.[3]

2. This common law privilege is distinct from any constitutional privilege which may be conferred by the first amendment. *See* III *infra*.

3. Amici curiae raise the possibility that Avins consented to the defamation by permitting DiBona to attend the luncheon. Under Restatement (Second) of Torts § 503, "[t]he consent of another to the publication of defamatory mate-

We therefore conclude that the jury was properly permitted to consider whether White's remarks about the book purchase incident were defamatory. We are faced, however, with a difficult problem. No special interrogatories or verdict form were requested or sent to the jury. It is therefore impossible to determine if the jury based its verdict on all three allegedly defamatory statements or whether the verdict was based on only one or two of the incidents. Inasmuch as we have concluded that two of the three incidents of defamation should not have been submitted to the jury, there is the distinct possibility that if we affirm the jury's verdict, we may do so on the basis of non-defamatory statements. "Where . . . a general verdict may rest on either of two claims—one supported by the evidence and the other not—a judgment thereon must be reversed." *Albergo v. Reading Co.*, 372 F.2d 83, 86 (3d Cir.), cert. denied, 386 U.S. 983, 87 S.Ct. 1284, 18 L.Ed.2d 232 (1967). *Accord, United New York and New Jersey Sandy Hook Pilots Association v. Halecki*, 358 U.S. 613, 619, 79 S.Ct. 517, 520, 3 L.Ed.2d 541 (1959); *Simko v. C & C Marine Maintenance Co.*, 594 F.2d 960, 967 (3d Cir.), cert. denied, 444 U.S. 833, 100 S.Ct. 64, 62 L.Ed.2d 42 (1979). We therefore will reverse the judgment of the district court and remand for a new trial on the defamation count limited to the alleged luncheon defamatory remarks about the misrepresentation to the Accreditation Committee concerning the book purchase.

### III.

We are left with the difficult task of determining the standard of proof Avins must meet on remand to sustain his claim of defamation against White. White argues that apart from any common law privilege, he possessed a qualified first amendment privilege because Avins was a "public figure" and therefore must under the rule of *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its progeny proved by "clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974). *See Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265 (3d Cir. 1979) (en banc). The district court declined to hold that Avins was a public figure and instructed the jury that Avins need only prove defamation by a preponderance of the evidence. White argues that Avins was a public figure within the meaning of the *New York Times* line of cases and that a higher standard of proof is therefore required.

In *New York Times, supra*, the Supreme Court held that the first amendment confers a qualified immunity on the news media when it is sued by a public official for defamation. A public official must prove "actual malice" on the part of the defendant; *i. e.*, that the defamatory statements were made with knowledge of their falsity or with reckless disregard of the truth. *New York Times, supra*, 376 U.S. at 280, 84 S.Ct. at 726. The Court soon expanded this immunity to defamation suits brought by "public figures." *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). The Court in *Gertz, supra*, 418 U.S. 345, 94 S.Ct. 3009, gave a description of who may be a public figure:

> For the most part those who attain [public figure] status have assumed roles of especial prominence in the affairs of soci-

---

rial concerning him is a complete defense to his action for defamation." They argue that the purpose of the luncheon obviously was to discuss accreditation problems of the school. If Avins had any reservations about DiBona's presence at the luncheon or had any sensitivity to discussion of accreditation matters in DiBona's presence, he should have objected. Amici assert that Avins prompted the discussion and thereby impliedly consented to take the risk that any admitted act on his part might be the

basis of highly unfavorable comment. Moreover, even after the comment on the admitted nighttime purchase of the U.S.Code Service had been offered, Avins did not object to the subject or deny that the incident had occurred. Although there is considerable merit to this argument, White did not raise this defense in his answer and we find no indication that the defense of consent was considered by the jury. We therefore may not consider the issue for the first time on appeal.

ety. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment.

The *Gertz* test envisions basically two types of public figures: (1) those who are public figures for *all* purposes; and (2) those who are public figures only in the context of a particular public controversy. The latter type of public figure has proven to be the more difficult to define.

In *Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976), the Court held that the socialite wife of a wealthy industrialist was not a public figure despite her highly publicized divorce because she had not freely chosen to publicize her private life. The Court in *Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979), held that a mental health researcher who had received a federal grant was not a public figure in a defamation suit brought against Senator William Proxmire for his bestowal of a "Golden Fleece Award." In *Hutchinson*, the defendant had himself created the controversy into which the plaintiff was drawn and the Court held that the defendant could not transmute the plaintiff into a public figure by his own action. *Id.* at 135, 99 S.Ct. at 2688. Finally, the Court in *Wolston v. Reader's Digest Ass'n*, 443 U.S. 157, 99 S.Ct. 2701 (1979), held that a plaintiff who had appeared before a grand jury investigating espionage in the 1950's had not voluntarily injected himself into a public controversy and was not a public figure. The Court indicated that the plaintiff "was dragged unwillingly into the controversy." *Id.* at 166, 99 S.Ct. at 2707.

The policy behind according public figures less protection against defamatory statements is bottomed on several ideas. Public figures generally have "greater access to channels of effective communication and hence have a more realistic opportunity

to counteract false statements than private individuals enjoy." *Gertz, supra*, 418 U.S. at 344, 94 S.Ct. at 3009. Also, public figures, because they have voluntarily chosen to involve themselves in public controversies assume a risk of increased injury from defamation. *See, id.* at 345, 94 S.Ct. at 3009; *Wolston, supra*, 443 U.S. at 164, 99 S.Ct. at 2706; *Steaks Unlimited v. Deaner*, 623 F.2d 264, at 273 (3d Cir. 1980). In short, public figures are expected to be more resilient to criticism.

We have no difficulty in concluding that Avins is not a public figure for all purposes under the first part of the *Gertz* test. Although Avins was apparently well known in legal academic circles, we do not believe he possessed the fame and notoriety in the public eye necessary to make him a public figure for all purposes. This leaves the question whether Avins is a public figure in the limited context of the DLS accreditation struggle. We must accordingly consider whether (1) the DLS accreditation struggle was a public controversy and (2) if so, whether Avins voluntarily injected himself into that controversy.

■ Our first task is to determine whether DLS' accreditation struggle may fairly be considered a "public controversy." The D.C. Circuit has recently stated: "A public controversy is not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, at 1296, (D.C.Cir. 1980). The district court concluded that the DLS accreditation struggle was only of interest to the school, students and their families and was not of general public interest. We believe the record is to the contrary.

Although DLS was formed and operated as a purely private law school, its success or failure was of importance to the Delaware State Bar as well as to any individual interested in attending an accredited law school in Delaware. It is the only law school in the State of Delaware. Accreditation of DLS would create a new source of attor-

neys who could qualify to take the Delaware Bar examinations and be admitted to practice in the state. Furthermore, a majority of DLS students were from out of state. Thus, DLS' accreditation would also affect the interests of students from a variety of locales and admission to State Bars outside of Delaware.

Further, there is evidence in the record that mass meetings were held and that individuals from other states concerned about DLS visited the school. The local news media, as well as the Delaware Bar Association publicized the events surrounding DLS' formation and struggle for accreditation. We conclude that DLS' accreditation affected the "general public or some segment of it in an appreciable way," *Waldbaum, supra*, at 1296, and that therefore the DLS accreditation struggle was a public controversy. We therefore hold that DLS' accreditation was a legitimate public controversy within the meaning of *Gertz*.

We now must consider whether Avins voluntarily injected himself into the public controversy concerning the accreditation. The court in *Waldbaum* stated: "[T]he court must ask whether a reasonable person would have concluded that this individual would play or was seeking to play a major role in determining the outcome of the controversy . . . ." 627 F.2d at 1298.

We have no difficulty in concluding that Avins voluntarily injected himself into the controversy surrounding DLS' accreditation. As creator, chief architect, and the first dean of DLS, Avins spearheaded its drive toward accreditation. Indeed, the first major hurdle which Avins had to surmount in behalf of DLS was accreditation. The record reveals that from the outset Avins, as dean, was actively involved in every facet of the accreditation struggle. He, in fact, invited the first three accreditation teams to inspect DLS and he personally presented DLS' case before the Council and Accreditation Committee. Unlike the plaintiffs in *Firestone, supra, Hutchinson, supra*, and *Wolston, supra*, Avins was not involuntarily dragged into a controversy not of his own making. It was Avins who as dean of DLS officially requested, invited, and affirmatively invoked the accreditation process of the American Bar Association. We therefore conclude that Avins played an affirmative and aggressive role in the accreditation process and that he was a public figure for that limited purpose.

Our holding that Avins is a public figure in the context of the DLS accreditation controversy would seemingly require that on retrial he be required to prove by clear and convincing evidence that White made the alleged comments about Avins' involvement in the book misrepresentation and that he knew they were false or that he made them with reckless disregard for their truth. However, the Supreme Court has not yet decided whether the *New York Times* privilege applies to a non-media, private defendant such as White.

White's remarks about Avins' role in the book incident were directed at an extremely narrow audience consisting principally of Judge DiBona. Thus, this case in no way resembles the media cases. This is not a case of an attack in a public medium against an unwilling target. Although the *New York Times* privilege was born in the context of the institutional press' need to be free from the threat of libel suits so that public debate on public issues be vigorous and open, we see no indication in that decision that the privilege should be limited to the media's exercise of the first amendment right to freedom of press. Indeed, the evil sought to be avoided by the *New York Times* privilege is self-censorship: "A rule compelling the critic of official conduct to guarantee the truth of all his factual assertions—and to do so on pain of libel judgments virtually unlimited in amount—leads to a comparable 'self-censorship.'" 376 U.S. at 279, 84 S.Ct. at 725.

We believe the importance of the accreditation process underscores the need for extension of the *New York Times* privilege to a private individual criticizing a public figure in the course of commenting on matters

germane to accreditation.[4] An accreditation evaluation by its nature is critical; the applicant school invites critical comments in seeking accreditation. In order to succeed, individuals involved in the accreditation process need to be assured that they may frankly and openly discuss accreditation matters. White, in criticizing Avins at the luncheon, was expressing a candid view of Avins' conduct during the accreditation process. To require an individual like White to insure the accuracy of his comments on accreditation matters would undoubtedly lead to self-censorship which will jeopardize the efficacy and integrity of the accreditation process itself. Since the public is vitally affected by accreditation of educational institutions, we believe that self-censorship in the accreditation process would detrimentally affect an area of significant social importance.

Nor does the narrow audience in which the alleged defamatory statement was published persuade us that the *New York Times* privilege should not be extended to a person in White's position. Indeed with a narrow audience, the possibility of injury from an untruthful statement may be significantly less. More fundamentally, however, we believe that non-extension of the *New York Times* privilege to private individuals like White creates a dangerous disequilibrium between the first amendment's guarantees of freedom of speech and the press. As the court stated in *Davis v.*

*Schuchat*, 510 F.2d 731, 734 n.3 (D.C.Cir. 1975):

> Our understanding of *New York Times* and its offspring is that private persons and the press are equally protected by the requirement that false comment about public figures must be knowing or in reckless disregard of the truth in order to be actionable. It seems to us a necessary corollary that comment about public figures should be equally protected whether made in mass media or in private. This is required both by the First Amendment, which speaks equally of freedom of speech and of the press, and by common sense, for if the "press" were given more protection than "private speech," persons would be encouraged to rush allegations into wide publication rather than to carefully present them to informed parties for verification or refutation in a more private setting.

We find this reasoning persuasive. Indeed, we think it would be anomalous to accord a Delaware newspaper a qualified immunity for publishing charges of misrepresentation by Avins but deny the same immunity to White. Accordingly, we hold that Avins must prove by clear and convincing evidence that White made his accusation of the book misrepresentation knowing of its falsity or with reckless disregard for the truth.[5]

White urges that no retrial is necessary because there is no clear and convincing

---

**4.** We need not at this time consider whether the *New York Times* privilege extends to *all* private individuals regardless of the context in which the alleged defamatory statement is uttered.

**5.** We do not believe that our decision today conflicts with *Grove v. Dun & Bradstreet, Inc.*, 438 F.2d 433 (3d Cir.), *cert. denied*, 404 U.S. 898, 92 S.Ct. 204, 30 L.Ed.2d 175 (1971). In *Grove*, a corporation brought a libel action against the defendant who had issued an allegedly false credit report to its subscribers. We held that the *New York Times* privilege did not apply to the dissemination of a private credit report. *Grove*, however, is distinguishable from the present case. In *Grove* we held under the pre-*Gertz* test of public figure status as involving a matter of legitimate public concern, *Rosenbloom v. Metromedia, Inc.*, 415 F.2d 892 (3d Cir. 1969), *aff'd*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), plaintiff's business

or credit standing was not a matter of real public interest. *See* 438 F.2d at 436–37. In the instant case, we have concluded that the DLS accreditation struggle was a public controversy.

In *Grove*, we also indicated that the medium in which the defamatory statement was communicated—a private subscription credit reporting service—did not entitle the defendant to the *New York Times* privilege. *See* 438 F.2d at 437. This language is arguably dicta and may be limited to the situation of commercial credit reports. *See generally Hood v. Dun & Bradstreet*, 486 F.2d 25, 29 (5th Cir. 1973), *cert. denied*, 415 U.S. 985, 94 S.Ct. 1580, 39 L.Ed.2d 882 (1974). Even if this language is not dicta, we believe *Grove* is nonetheless distinguishable. The subscribers to the credit reports had only a generalized interest in the defendant's report on the plaintiff corporation whereas in the instant case, all those present at the lunch-

evidence that he made his charge of book fraud knowing that it was false or with reckless disregard of the truth. Although there appears to be scant evidence that White made a knowingly false statement, it is possible that he had recklessly failed to ascertain the facts surrounding the book incident. We believe it is properly the task of the jury to weigh the evidence and we cannot say as a matter of law that Avins cannot prove that White's statements were made with actual malice. We therefore believe that a new trial is warranted.

### IV.

 The sole remaining issue before us is Avins' appeal from the jury's verdict in favor of White on the interference with advantageous relations claim. The essence of this claim is that White's actions in the accreditation process caused Widener College to eventually terminate Avins as a professor at DLS.

Avins first claims the court erred in instructing the jury as to the scope of White's privilege to convey information about the DLS accreditation process to other individuals. We have examined the court's charge in this regard and find no error. More significantly, Avins maintains the court's instruction on proximate cause was too narrow for an intentional tort like interference. The court charged:

> Mr. White can be held liable only if his activities contributed in a material and substantial way to the removal decisions made by [Widener], and were a factor without which the removals would not have occurred.

We see no error in this instruction. Although interference is an intentional tort, the Restatement (Second) of Torts § 767(f) specifically lists as a factor of the tort "the proximity or remoteness of the actor's conduct to the interference." The Restatement emphasizes that the interference even if intentional cannot be remote. *Id.* Comment (b). The court's jury charge under-

scores the substantial relation between White's actions and Widener's dismissal of Avins which must exist before liability for interference obtains. We believe the jury charge adequately set forth the causation requirement for interference of advantageous relations and we accordingly decline to order a new trial on the interference count.

### V.

In sum, we conclude that Avins may maintain his defamation action against White on the basis of White's charge of book misrepresentation, but the jury, on retrial, must be instructed that Avins, as a public figure, must prove by clear and convincing evidence that White's accusation was made with actual malice. The judgment of the district court will be reversed in No. 79–1748, the jury award vacated, and the case remanded for proceedings not inconsistent with this opinion. The judgment of the district court in No. 79–1747 will be affirmed.

Each side to bear its own costs in No. 79–1748. Costs taxed against appellant in No. 79–1747.

---

eon had a vital interest in the accreditation controversy. Thus, the forum in the instant case militates in favor of application of the

*New York Times* privilege to insure that discussion be robust and uninhibited.