Victor BUSSIE

v.

**Reed LARSON and National Right to Work Committee.**

Civ. A. No. 76–218–B.

United States District Court, M. D. Louisiana.

Nov. 17, 1980.

John L. Avant, Dodd, Barker, Avant, Wall & Thomas, Baton Rouge, La., for plaintiff.

Frank M. Coates, Jr., Taylor, Porter, Brooks & Phillips, Baton Rouge, La., Cicero Sessions, Robert E. Barkley, Jr., Sessions, Fishman, Rosenson, Snelling & Boisfontaine, New Orleans, La., for defendants.

POLOZOLA, District Judge:

This diversity suit for defamation presents the following legal issue which the Courts have not yet decided: does the standard set forth in *New York Times v. Sullivan* apply to non–media defendants? For reasons set forth hereinafter, the Court holds that it does.

This defamation suit was filed by Victor Bussie against the National Right to Work Committee and Reed Larson, its president. Plaintiff contends that he was defamed in a letter written and mailed by the defendants to some 53,000 citizens of the State of Louisiana on or about June 15, 1976.

After reviewing the very voluminous record and pretrial order filed in this case, the Court directed the parties to submit a memorandum on the following legal issues:

(1) Is the plaintiff, Victor Bussie, a public official?

(2) Is there a different standard of proof in defamation suits filed by public figures, as opposed to those filed by public officials?

(3) Does the standard set forth in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) apply to non–media defendants?

## I.  BACKGROUND

Victor Bussie is the president and chief executive officer of the Louisiana AFL–CIO, a position he has held since 1956. The Louisiana AFL–CIO is a council of labor organizations limited to local unions chartered by an international union affiliated with the American Federation of Labor–Congress of Industrial Organizations (National AFL–CIO) and councils of unions so chartered. In 1976 the Louisiana Legislature enacted Act 97 which was commonly referred to as the Right to Work Act. For many years the Louisiana AFL–CIO opposed legislation of the type enacted by Act 97 of the regular session of the 1976 Louisiana Legislature. On the other hand, the National Right to Work Committee has for

many years adopted an official policy of encouraging and supporting adoption by states of the so–called Right to Work Laws.

On January 15, 1976 an incident occurred on a construction project at the Jupiter Chemical Company in Lake Charles, Louisiana, which resulted in the death of one person, injuries to other persons and property damage to the site. It was widely reported in the media following the January 15, 1976 incident that the persons responsible for the Jupiter violence were officers and members of certain AFL–CIO construction unions in Calcasieu Parish, Louisiana. Subsequent to the January 15, 1976 incident which occurred at the Jupiter Chemical plant and prior to the passage of Act 97 of the 1976 Legislature, the defendants wrote and mailed the letter of June 15, 1976 which is the subject of this lawsuit.

In the pre–trial order which was filed in the record of this case, the parties have agreed and stipulated to the following facts:

"76. Victor Bussie, who has been President of the Louisiana AFL–CIO continuously since 1956, has been widely reported to be the leader of union labor in Louisiana and is recognized by many persons in Louisiana as such. D–2.

77. Some people have stated that Victor Bussie is one of the most politically powerful men, if not the most politically powerful man, in the State of Louisiana. D–3.

78. Victor Bussie has been appointed to many United States governmental bodies as follows:

(a) Victor Bussie is a member of the Defense Orientation Conference Association, to which he was appointed by the Secretary of Defense six or seven years ago, which association assists in formulating our national defense policy and advises the Secretary of Defense on national defense policy.

(b) Victor Bussie was a member of the National Defense Executive Reserve, to which he was appointed by President Kennedy and remained a member until about two years ago, which Reserve is subject to call by the federal government whenever a national crisis exists and which is primarily for the purpose of finding persons to replace public officials who might be incapacitated during a nuclear war.

(c) Victor Bussie was appointed by the U.S. Postmaster General to the 15 man Post Office Advisory Board which held hearings in many cities throughout the country and recommended to the U.S. Postmaster General the formation of the United States Postal Service which now exists.

(d) Victor Bussie was a member of the National Civil Defense Council for five or six years which met regularly, held hearings in Washington, D. C., and made recommendations to the Director of the Office of Emergency Preparedness, who appointed him to that position, to prepare a program for the protection of the civilian population of the United States in the event of a national emergency.

(e) Victor Bussie was appointed by President Kennedy and reappointed by Presidents Johnson and Nixon to the President's Committee on Mental Retardation which committee met frequently in Washington, D. C., held hearings, studied the needs of the mentally retarded and made recommendations to the President and the Secretary of Health, Education and Welfare on the needs of the mentally retarded, which recommendations led to a great number of changes in federal legislation particularly in programs for mentally retarded adults.

(f) Victor Bussie is on the Policy Advisory Committee, Section 208 of the Federal Water Pollution Control Act of 1972, to which he was appointed by the Secretary of Com-

merce and which advises on the Clean Water Act.

(g) Victor Bussie was appointed by the Secretary of Labor to the Regional Manpower Advisory Committee, U. S. Department of Labor.

(h) Victor Bussie has been on other federal governmental bodies. D–8.

79. Victor Bussie has been appointed to many Louisiana governmental bodies as follows:

(a) Victor Bussie is on the five-man Louisiana Commission on Government Ethics, and has been by appointment of each Governor of Louisiana since that commission was first established, which commission enforces the ethics laws of the State of Louisiana prohibiting conflicts of interest of state employees and appointed officials, has subpoena power, holds hearings, administers oaths, is authorized to instigate disciplinary action against public employees of the State of Louisiana, and the actions of which commission have led to the suspension of a number of public employees in Louisiana.

(b) Victor Bussie has been a member of the five–man Louisiana Public Facilities Authority continuously to date since it was established in 1974, and is currently the chairman of the Authority, which issues bonds to finance public facilities and which has issued $35,000,000.00 in bonds for such facilities.

(c) Victor Bussie has been on the Louisiana Highway Safety Commission since John McKeithen was Governor of Louisiana, and has been Vice–Chairman of that commission for the last six years, which commission allocates approximately five or six million dollars per year in federal funds to various state agencies for highway safety projects.

(d) Victor Bussie is a member of the Louisiana Advisory Commission on Coastal/Marine Resources, Sea Grant Advisory Council which recommends the allocation of federal funds for sea grant activities to Louisiana universities.

(e) Victor Bussie was on the Special Joint Legislative Committee on Reorganization of the Executive Branch from the time it was established by the Louisiana Legislature until it went out of existence in 1978, the purpose of which committee was to follow up on the reorganization of state government to make sure that the mandate of the Legislature was carried out and to make recommendations for future legislation on reorganization of state government and which committee had subpoena power and held hearings.

(f) Victor Bussie was appointed to the Joint Legislative Committee established by Senate concurrent resolution No. 31 of the 1970 regular session of the Louisiana Legislature, which was commonly called the Anti–Mafia Committee, which committee had the power to issue subpoenas and administer oaths and hold hearings and which exercised those powers in investigating the influence of organized crime on Louisiana state government.

(g) Victor Bussie was appointed to the Advisory Council on Mental Health, Louisiana Department of Hospitals, by the Commissioner of Mental Health and has been on that council for ten years, the purpose of which council is to advise the Department of Hospitals and the Secretary of the Health and Human Resources Administration regarding mental health facilities.

(h) Victor Bussie was appointed to the Louisiana Health and Human Resources Administration Advisory Board by the Governor, has been on that board for about eight years, and has been chairman of the Mental Health and Mental Retardation

Committee of that board, which committee advises the board on problems dealing with mental health and the mentally retarded.

(i) Victor Bussie was appointed by the Governor of Louisiana to the Louisiana State Manpower Service Council and has been a member of that council for the last five years, which council studies the manpower needs of the State of Louisiana, the need for training workers, the need for developing new manpower resources, and makes recommendations to the Secretary of Labor of the State of Louisiana and supports state legislation dealing with training of workers and similar matters.

(j) Victor Bussie is on the Governor's Advisory Commission on Ad Valorem Taxation, and has been on that commission since its inception, and the purpose of the commission is to advise the Louisiana Legislature on the proper implementation of the state law on ad valorem taxation.

(k) Victor Bussie has been on the Ad Hoc Committee, Executive Order No. 58, Legislative Committee to Study Possibility of Acquiring Certain Properties as Additions to State Capitol Complex, since his appointment by the Governor several years ago, the purpose of which committee is to study the practicality of buying Our Lady of the Lake Hospital in Baton Rouge, Louisiana for use by state government.

(*l*) Victor Bussie is on the Committee to Study Louisiana Appellate Court Caseloads and Procedures, to which he was appointed by the Administrator of the Supreme Court of Louisiana three years ago, and that committee is studying the caseloads and procedures of the Louisiana appellate courts.

(m) Victor Bussie was on the Special Legislative Committee on Central Purchasing, Receipts, and Disbursements, the purpose of which was to study the activities of the Division of Administration of the State of Louisiana, and to recommend revised procedures for centralized purchasing by the state government.

(n) Victor Bussie was on the Fireman's Supplemental Pay Board, which determined which firemen were eligible to receive supplemental pay from the State of Louisiana.

(*o*) Victor Bussie has been on many other state boards, agencies, and commissions. D–9.

80. At all times pertinent and material hereto, including June 15, 1976, Victor Bussie was a public figure within the meaning of *New York Times v. Sullivan* and its progeny. D–16."

## II.   LEGAL ISSUES INVOLVED IN THIS SUIT

A.   Is the plaintiff, Victor Bussie, a public official?  The first issue the Court must determine is whether or not Victor Bussie is a public official.  The plaintiff has conceded that Bussie is a public figure.  Because the Court has concluded, for reasons to be set forth hereinafter, that there is no difference in the standard of proof in defamation suits involving public officials and public figures, it is not necessary for the Court to determine at this time whether or not the plaintiff is a public official.

B.   Is there a different standard of proof in defamation suits filed by public figures, as opposed to those filed by public officials?

After considering the jurisprudence, including the recent decision rendered by the Fifth Circuit Court of Appeals in *Miller v. Transamerican Press, Inc.*, 621 F.2d 721 (5 Cir. 1980), the Court concludes that the standards set forth in *New York Times v. Sullivan,* supra, should apply to public figures as well as public officials.

In *Miller v. Transamerican Press, Inc.*, Murray W. "Dusty" Miller, the Secretary–Treasurer of the International Brotherhood

of Teamsters, filed a suit for defamation against Transamerican Press, Inc. Miller, like Bussie, was a well–known labor leader. The Fifth Circuit Court of Appeals concluded that because "Miller is a public figure he must prove Transamerican acted with malice when it published the article". 621 F.2d at p. 724. The Court in the *Miller* case relied on and followed a recent decision decided by the Fifth Circuit Court of Appeals in *Long v. Arcell*, 618 F.2d 1145, 1147 (5 Cir. 1980), wherein the Fifth Circuit Court of Appeals set forth the following standard to be followed in defamation suits involving public figure plaintiffs:

> "In order for the plaintiffs to recover damages, therefore, they were required to prove by clear and convincing evidence that the defendants acted with actual malice as defined in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and its progeny. See *Curtis Publishing Company v. Butts*, 388 U.S. 130, 155, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094, 1111 (1967). A publisher acts with actual malice when he prints a story with knowledge that it is false or with reckless disregard for the truth. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789, 806 (1974); *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968)."

C. Does the standard set forth in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) apply to non–media defendants?

The final issue the Court must determine in this case is whether or not the standard set forth in *New York Times v. Sullivan*, supra, applies to non–media defendants. In *Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979), the United States Supreme Court refused to resolve the question which is now before the Court. After concluding that the plaintiff, a research behavioral scientists who received one of Senator William Proxmire's "Golden Fleece Awards", was not a public figure, the United States Supreme Court said in a footnote:

> "16. Neither the District Court nor the Court of Appeals considered whether the *New York Times* standard can apply to an individual defendant rather than to a media defendant. At oral argument, counsel for Hutchinson stated that he had not conceded that the *New York Times* standard applied. Tr. of Oral Arg. 18. This Court has never decided the question; our conclusion that Hutchinson is not a public figure makes it unnecessary to do so in this case." 443 U.S. at 133, 99 S.Ct. at 2687.

After reviewing the jurisprudence and considering the facts of this case, this Court now holds that in defamation cases involving public figures and public officials, the standard set forth in *New York Times v. Sullivan* does apply to non–media defendants.

The facts of this case clearly show that the defendants are not media defendants. It is generally accepted that newspapers, television, radio and magazines are encompassed in the broad definition of contemporary "media" in that they disseminate information to the general public on a wide–spread basis. The alleged defamatory publication in this case was a letter written on Right to Work Committee letterhead and signed by the defendant Larson. This letter was sent to some 53,000 citizens of the State of Louisiana. However, there was no publication in the sense that the letter was made available to the general public through the media. While the mailing of the letter may constitute a publication in order to establish a cause of action in a defamation suit, there was not a publication in a "medium" so as to automatically trigger the application of the standard set forth in *New York Times v. Sullivan*. Thus, the Court concludes that the defendants in this case are not media defendants.

In the many defamation suits which the United States Supreme Court has considered, the Court has attempted to afford protection to the reputation of individuals while at the same time guaranteeing free-

doms which are protected by the First Amendment. Where public officials and figures are involved, the United States Supreme Court has held that the standard set forth in *New York Times v. Sullivan*, supra, shall be applied to the case. In reaching this decision, the Court has balanced two competing principles, namely, the need for a vigorous and uninhibited press that will serve the strong public interest in learning about public figures and officials and the need to protect the personal reputations of individuals. Thus, in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789, (1974), the United States Supreme Court stated:

> "The New York Times standard defines the level of constitutional protection appropriate to the context of defamation of a public person. Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures and those who hold governmental office may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth. This standard administers an extremely powerful antidote to the inducement to media self–censorship of the common–law rule of strict liability for libel and slander. And it exacts a correspondingly high price from the victims of defamatory falsehood. Plainly many deserving plaintiffs, including some intentionally subjected to injury will be unable to surmount the barrier of the New York Times test. Despite this substantial abridgment of the state law right to compensation for wrongful hurt to one's reputation, the Court has concluded that the protection of the *New York Times* privilege should be available to publishers and broadcasters of defamatory falsehood concerning public officials and public figures." 418 U.S. at 341, 94 S.Ct. at 3008.

This Court does not believe that two separate standards should exist in defamation cases involving public officials and figures— one for media defendants and one for non–media defendants. In determining whether or not a public official or public figure has been defamed, the same test should be applied to both media and non–media defendants to ensure a proper balance between First Amendment rights and damage to the reputation of the public official or figure.

While there have been no cases which have directly decided this issue, there have been some decisions rendered which have discussed the issue. Thus, in *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265 (3 Cir. en banc 1979), the Third Circuit Court of Appeals refused to decide the issue of whether or not the *New York Times v. Sullivan* rule should apply in cases involving non–media defendants. In the *Chuy* case, the defendants were sued for alleged defamatory statements regarding the plaintiff's physical condition made by the defendant's team doctor to a local newspaper. The lower court found that the plaintiff had been defamed and awarded damages. In rendering its decision, the Federal District Court found that the non–media defendant such as the Philadelphia Eagles Football Club was entitled to the *Times* standard. Thus, in a footnote the court concluded:

> "We also note that the very purpose of the media is to inform private persons (the public) and facilitate effective discussion and consideration of the events of the day. In terms of the First Amendment policies underlying *Times* and the hallowed role of private dialogue in our society, it seems inappropriate to us to distinguish media from non–media speech and to elevate the media's role in aiding the public in its discussion above private discussions occurring in everyday life." 431 F.Supp. at 266, n.20.

The Third Circuit Court of Appeals reversed the decision of the lower court. However, the Court avoided determining whether or not the *New York Times* rule applied to non–media defendants stating:

> "Without deciding whether the evidence of defamatory content should be measured by that standard or one less stringent, we are satisfied that Chuy failed to prove defamation." 592 F.2d at 1281.

In an earlier case decided by the Circuit Court of Appeals for the District of Columbia, *Davis v. Schuchat*, 510 F.2d 731 (D.C. Cir.1975), the Court addressed the non–media defendant issue indirectly in a footnote. After noting that freedom of the press does not require that reporters be allowed to assert in private that which would subject them to liability if said in the public media, the Court stated in the footnote:

"We do not, of course, imply that a journalist's protection is in any way reduced when he speaks of a public figure in private. Our understanding of *New York Times* and its offspring is that private persons and the press are equally protected by the requirement that false comment about public figures must be knowing or in reckless disregard of the truth in order to be actionable. It seems to us a necessary corollary that comment about public figures should be equally protected whether made in mass media or in private. This is required both by the First Amendment, which speaks equally of freedom of speech and of the press, and by common sense, for if the "press" were given more protection than "private speech," persons would be encouraged to rush allegations into wide publication rather than to carefully present them to informed parties for verification or refutation in a more private setting." 510 F.2d at 734.

This same passage was quoted approvingly in a recent case decided by the Third Circuit Court of Appeals in *Avins v. White*, 627 F.2d 637 (3 Cir. 1980). In *Avins*, the plaintiff was the Dean of the Delaware Law School. The Court found that he was a public figure because he had voluntarily injected himself into a public controversy surrounding his school's efforts to secure accreditation from the American Bar Association. The defendant was a member of the American Bar Association's accrediting team and allegedly had made defamatory remarks about the plaintiff which resulted in the plaintiff's dismissal as the Dean of the Law School. In discussing the standard to be applied in that case, the Third Circuit Court of Appeals stated:

"Our holding that Avins is a public figure in the context of the DLS accreditation controversy would seemingly require that on re–trial he be required to prove by clear and convincing evidence that White made the alleged comments about Avins' involvement in the book misrepresentation and that he knew they were false or that he made them with reckless disregard for their truth. However, the Supreme Court has not yet decided whether the *New York Times* privilege applies to a non–media, private defendant such as White."

In the *Avins* case the Court specifically limited its holding to matters germane to the accreditation process, noting that the nature of the procedure requires criticism and frank and open discussion of the issues involved and the activities surrounding the evaluative process. The Court was concerned that self–censorship would invade the accreditation process and expressed support for a vital, robust and uninhibited flow of information in such matters. The Court then stated:

"Nor does the narrow audience in which the alleged defamatory statement was published persuade us that the *New York Times* privilege should not be extended to a person in White's position. Indeed with a narrow audience, the possibility of injury from an untruthful statement may be significantly less. More fundamentally, however, we believe that non–extension of the *New York Times* privilege to provide individuals like White creates a dangerous disequilibrium between the first amendment's guarantees of freedom of speech and the press."

Under the facts presented in this case, the Court believes that the defendants should be accorded the same rights as a media defendant and, therefore, the Court finds that the standards set forth in *New York Times v. Sullivan* are applicable herein. There is little doubt that the plaintiff in this case is a public figure. The matter which the plaintiff and the defendants were debating at the time the letter which is the subject of this lawsuit was written was of

1114

great public interest and debate. The debate surrounding the right to work legislation generated enormous statewide and even national notoriety. Many individual citizens, representing both the views of labor and those of management appeared for committee meetings and floor debates at the Louisiana State Capitol. The violence which occurred in Lake Charles at the Jupiter Chemical Company plant was also a matter of great public interest and discussion. The Court can see no rational reason under the facts of this case for affording media defendants more protection than a private citizen where, as in this case, private citizens and organizations direct their comments against public officials and figures. To hold otherwise would create "a dangerous disequilibrium between the First Amendment's guarantees of freedom of speech and the press." *Avins v. White,* supra. For this reason, the Court finds that *Grove v. Dun & Bradstreet, Inc.,* 438 F.2d 433 (3 Cir. 1971) is inapplicable under the facts of this case.

Therefore, for the above reasons, the Court finds that the standards set forth in *New York Times v. Sullivan,* supra, are applicable to this case. Therefore, in order for the plaintiff to recover damages in this case, he must prove by clear and convincing evidence that the defendants acted with actual malice as defined in *New York Times v. Sullivan,* supra.