**Bertell OLLMAN, Appellant,**

v.

**Rowland EVANS, Robert Novak.**

**No. 79-2265.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 5, 1980.

Decided Aug. 5, 1983.

Rehearing En Banc Granted
Oct. 6, 1983.*

* Opinion and judgment vacated.

Isidore Silver, New York City, a member of the Bar of the Supreme Court of New York, pro hac vice, by special leave of court, with whom Alan Dranitzke, Washington, D.C., was on the brief, for appellant.

A. Daniel Feldman, Chicago, Ill., for appellees. Ronald A. Jacks, Chicago, Ill., also entered an appearance for appellees.

Before ROBINSON, Chief Judge, WALD, Circuit Judge, and MacKINNON, Senior Circuit Judge.

PER CURIAM:

The judgment of the District Court is reversed and the case is remanded to the District Court for further proceedings. Chief Judge Robinson concurs in the judgment for the reasons set forth in his opinion. Circuit Judge Wald concurs in the remand for the reasons set forth in her opinion. Senior Circuit Judge MacKinnon concurs in the remand subject to the principles set forth in his opinion.

ROBINSON, Chief Judge:

This defamation suit is now before this court on the District Court's grant of summary judgment for the defense.[1] The appeal presents one major issue: Are allegedly defamatory statements of which the appellant complains representations of fact capable of supporting an action for libel or expressions of opinion unconditionally protected by the First Amendment? Because I think there may well be material issues of fact affecting the availability of the opinion privilege for several of the statements, I would reverse the judgment of the District Court and remand the case for further proceedings.

I

The appellant, Bertell Ollman, is a Marxist professor of political science.[2] In March, 1978, a search committee composed of political scientists at the University of Maryland nominated Ollman to head that institution's Department of Politics and Government.[3] The nomination was approved by the Provost of the University and the Chancellor of the College Park campus, and allegedly was faring quite well until the event precipitating this litigation transpired.[4]

The appellees, Rowland Evans and Robert Novak, are authors of a widely-published syndicated column.[5] On May 4, 1978, an article they prepared on Ollman's candidacy appeared in the Washington Post and other newspapers across the country.[6] Captioned "The Marxist Professor's Intentions," this column touched briefly on an asserted "public debate" over the propriety of Ollman's nomination, and then focused on what the authors denominated the "central question":

> ... not Ollman's beliefs, but his intentions. His candid writings avow his desire to use the classroom as an instrument for preparing what he calls "the revolution." Whether this is a form of indoctrination that could transform the real function of a university and transcend limits of academic freedom is a concern to academicians who are neither McCarthyite nor know-nothing.[7]

There followed several paragraphs which, by selected quotations from Ollman's writings, tended to suggest that Ollman regards the classroom as a forum for winning adherents to Marxism. The article then asserted:

> Such pamphleteering is hooted at by one political scientist in a major eastern university, whose scholarship and reputation as a liberal are well known. "Ollman has no status within the profession, but is a pure and simple activist," he said.

Confiding that "[w]hile Ollman is described in news accounts as a 'respected Marxist scholar,' he is widely viewed in his profession as a political activist," the column described Ollman as "an outspoken proponent

---

**1.** *Ollman v. Evans,* 479 F.Supp. 292 (D.D.C. 1979).

**2.** *Ollman v. Evans, supra* note 1, 479 F.Supp. at 292.

**3.** Complaint ¶ 4, *Ollman v. Evans,* No. 79–0526 (D.D.C.), Joint Appendix (J.App.) 6; admitted in Answer ¶ 4, *Ollman v. Evans, supra,* J.App. 13.

**4.** Complaint ¶ 4, J.App. 6; admitted in Answer ¶ 4, J.App. 13.

**5.** Complaint ¶ 3, J.App. 6; admitted in Answer ¶ 3, J.App. 13.

**6.** Complaint ¶ 5, J.App. 7; admitted in Answer ¶ 5, J.App. 13.

**7.** The text of the article appears in its entirety as an appendix to this opinion.

of 'political Marxism.'" It concluded by posing several questions:

> What is the true measurement of Ollman's scholarship? Does he intend to use the classroom for indoctrination? Will he indeed be followed by other Marxist professors? Could the department in time be closed to non-Marxists, following the tendency at several English universities?

Deeming libelous several statements and innuendoes in this piece, Ollman, through his counsel, wrote to Evans and Novak demanding that they print a retraction.[8] This they declined to do.[9] Ultimately, Ollman was denied the departmental chairmanship.[10] He alleges that loss of this post was attributable to false and defamatory statements in the column;[11] additionally, he avers that it damaged his reputation as a "scholar of integrity" and caused him "great distress and mental anguish."[12] Charging Evans and Novak with actual malice, he seeks punitive as well as compensatory damages.[13]

Evans and Novak moved for judgment on the single ground that "all of the allegedly libelous statements are statements of opinion protected by the First and Fourteenth Amendments to the Constitution of the United States."[14] The District Court agreed, characterizing the complained-of passages as "opinions," "conclusions," and "interpretations," all of which in its view were constitutionally insulated.[15] Perceiving no indication that any of the supporting data outlined in the column were false, and discerning no implication that there existed other, undisclosed facts that were defamatory, the court granted the motion.[16] On appeal, Ollman attacks each facet of the court's reasoning.

## II

The First Amendment embodies a special solicitude for unfettered expression of opinion. That proposition is traceable to *Gertz v. Robert Welch, Inc.,*[17] where the Court stated:

> We begin with the common ground. Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of

---

**8.** Complaint ¶ 9, J.App. 8; admitted in Answer ¶ 9, J.App. 14.

**9.** Complaint ¶ 9, J.App. 8; admitted in Answer ¶ 9, J.App. 14.

**10.** *Ollman v. Evans, supra* note 1, 479 F.Supp. at 292.

**11.** Complaint ¶ 10, J.App. 8.

**12.** *Id.*

**13.** Ollman has pleaded damages well in excess of the jurisdictional amount required by 28 U.S.C. § 1332 (1976), see Complaint ¶ 10, J.App. 8, and his opponents have not suggested that these allegations are specious or made in bad faith. See, *e.g., St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 288–289, 58 S.Ct. 586, 590, 82 L.Ed. 845, 848–849 (1938); *Apton v. Wilson,* 165 U.S.App.D.C. 22, 34, 506 F.2d 83, 95 (1974); *Sullivan v. Murphy,* 156 U.S.App.D.C. 28, 50, 478 F.2d 938, 960, *cert. denied,* 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973).

**14.** Motion For Judgment on The Pleadings or For Summary Judgment (filed May 10, 1979), *Ollman v. Evans, supra* note 3, Supplemental Appendix to Brief for Appellees (Supp.App.) 2.

This motion, framed alternatively as one for judgment on the pleadings or for summary judgment, was accompanied by copies of an article, an excerpt from a book, and a letter to the editor of the Washington Post, all written by Ollman; a letter demanding retraction, written by his attorney; and a complete copy of the newspaper column containing the allegedly defamatory remarks. See Supp.App. 2–3. These matters, outside the pleadings, apparently were considered by the District Court which, pursuant to Fed.R.Civ.P. 12(c), then properly treated the motion as one for summary judgment. See *Carter v. Stanton,* 405 U.S. 669, 671–672, 92 S.Ct. 1232, 1234, 31 L.Ed.2d 569, 572 (1972) (per curiam); *Mazaleski v. Treusdell,* 183 U.S.App.D.C. 182, 189, 562 F.2d 701, 708 (1977); *Moreland v. Western Pa. Interscholastic Athletic League,* 572 F.2d 121, 126–127 (3d Cir.1978); *Milwaukee Typographical Union No. 23 v. Newspapers, Inc.,* 639 F.2d 386, 390–391 (7th Cir.), *cert. denied,* 454 U.S. 838, 102 S.Ct. 144, 70 L.Ed.2d 119 (1981).

**15.** *Ollman v. Evans, supra* note 1, 479 F.Supp. at 294.

**16.** *Id.*

**17.** 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

judges and juries but on the competition of other ideas.[18]

While this passage was the first clear verbalization of the degree to which the Constitution preempts local libel laws in the area of defamatory opinion, the Court previously had hinted at limitations on governmental power to impose civil or criminal liability for statements of belief, judgment, or sentiment. In *New York Times Co. v. Sullivan,* the landmark decision that first explicated the interplay between constitutional guarantees of free speech and press and common law sanctions for defamatory misstatement, the Court observed:

> Since the Fourteenth Amendment requires recognition of the conditional privilege for honest misstatements of fact, it follows that a defense of fair comment must be afforded for honest expressions of opinion based upon privileged, as well as true, statements of fact. Both defenses are of course defeasible if the public official proves actual malice. . . .[19]

And in *Garrison v. Louisiana,* a prosecution for criminal libel, the Court again adverted to fair comment, finding it unnecessary to decide in the context of that case "whether appellant's statement was factual or merely comment, or whether a State may provide any remedy, civil or criminal, if defamatory comment alone, however vituperative, is directed at public officials."[20]

The opinion privilege set out in *Gertz* thus was foreshadowed in earlier pronouncements, although the degree of constitutional protection to be afforded statements of belief, judgment, or interpretation—a protection seemingly absolute under the *Gertz* formulation—might not have been fully anticipated. But while *Gertz* confirms the existence of a privilege for expressions of opinion, neither that nor any other Supreme Court decision has provided much guidance for recognizing statements that are "opinion" for First Amendment purposes.

*New York Times* involved misstatements obviously factual in nature about the handling of incidents of racial unrest by police,[21] and its reference to fair comment appears, almost as an afterthought, in a footnote at the end of the opinion. The allegedly libelous comments in *Garrison* —accusations that certain judges were lazy, inefficient, and corrupt—were more problematic. However, the Court disposed of the case on the ground that the criminal statute at issue penalized unconstitutionally both spitefully-motivated true accusations and negligently-made misstatements about public officials.[22] Because it invalidated the statutory basis for the prosecution, the Court did not find it necessary to classify the remarks as fact or opinion.[23]

*Greenbelt Cooperative Publishing Association v. Bresler,*[24] a pre-*Gertz* decision, has subsequently been treated by the Court as an "opinion" case,[25] even though it did not refer explicitly to the opinion-fact dichotomy. There the defendant newspaper had fully and truthfully reported the proceedings of a city council meeting at which Bresler's request for a zoning variance was the subject of heated debate. The reports quoted several speakers' characterization of Bresler's position as "blackmail."[26] After

18. *Id.* at 339–340, 94 S.Ct. at 3007, 41 L.Ed.2d at 805 (footnote omitted).

19. 376 U.S. 254, 292 n. 30, 84 S.Ct. 710, 732 n. 30, 11 L.Ed.2d 686, 713 n. 30 (1964).

20. 379 U.S. 64, 76 n. 10, 85 S.Ct. 209, 217 n. 10, 13 L.Ed.2d 125, 134 n. 10 (1964).

21. See 376 U.S. at 258–259, 84 S.Ct. at 714–715, 11 L.Ed.2d at 693–694.

22. 379 U.S. at 78, 85 S.Ct. at 217, 13 L.Ed.2d at 134–135.

23. *Id.* at 76 n. 10, 85 S.Ct. at 217 n. 10, 13 L.Ed.2d at 134 n. 10.

24. 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970).

25. See *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin,* 418 U.S. 264, 283–286, 94 S.Ct. 2770, 2781–2782, 41 L.Ed.2d 745, 761–763 (1974).

26. 398 U.S. at 7, 12–13, 90 S.Ct. at 1538, 1541, 26 L.Ed.2d at 11, 14.

determining that the jury had been improperly instructed on the meaning of "malice," the Court went on to hold that the complained-of statement could not support a verdict of libel even with a proper instruction.[27] Noting that both the background of Bresler's variance request and the developments at the council meeting had been accurately set out, the Court concluded:

> It is simply impossible to believe that a reader who reached the word "blackmail" in either article would not have understood exactly what was meant: it was Bresler's public and wholly legal negotiating proposals that were being criticized. No reader could have thought that either the speakers at the meeting or the newspaper articles reporting their words were charging Bresler with the commission of a criminal offense. On the contrary, even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable. Indeed, the record is completely devoid of evidence that anyone in the city of Greenbelt or anywhere else thought Bresler had been charged with a crime.[28]

*Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin*,[29] a companion case to *Gertz*, presented a somewhat similar set of facts.[30] The defendant union had published a member's newsletter in which it listed the plaintiff as a "scab," and quoted a "well-known piece of trade union literature, generally attributed to author Jack London,"[31] that defined "scab" as, among other things, "a traitor to his God, his country, his family and his class."[32] Once again, the Court found defective the "malice" instruction given to the jury; it then held the critical statements non-libelous as a matter of federal law. It reasoned that, in the context of the labor dispute which gave rise to the newsletter statement, "use of words like 'traitor' cannot be construed as representations of fact.... Such words were obviously used here in a loose, figurative sense to demonstrate the union's strong disagreement with the views of those workers who oppose unionization."[33] Recalling *Greenbelt*, the *Letter Carriers* Court found it "similarly impossible to believe that any reader of the Carrier's Corner would have understood the newsletter to be charging the appellees with committing the criminal offense of treason.... Jack London's 'definition of a scab' is merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members toward those who refuse to join."[34]

*Gertz* itself involved accusations that the plaintiff had a large police file, held an official position in a Marxist organization advocating violent seizure of government, and was a "Leninist" and a "Communist-fronter."[35] Although the first two observations seem clearly factual, the latter two conceivably could be regarded as expressions of the author's opinion. The Court, however, did not discuss the applicability of

---

27. *Id.* at 10–15, 90 S.Ct. at 1540–1542, 26 L.Ed.2d at 12–15.

28. *Id.* at 14, 90 S.Ct. at 1542, 26 L.Ed.2d at 15 (footnote omitted).

29. *Supra* note 25.

30. The holding in *Letter Carriers* actually rested on the protection that federal labor laws extend to communications made in the course of a labor dispute. While the Court expressly did not reach the First Amendment claim, see *id.* 418 U.S. at 283 n. 15, 94 S.Ct. at 2781 n. 15, 41 L.Ed.2d at 761 n. 15, its interpretation of the labor laws rested heavily on First Amendment defamation cases, including *Gertz*. See 418 U.S. at 282–286, 94 S.Ct. at 2780–2782, 41

L.Ed.2d at 760–763. It therefore seems safe to regard *Letter Carriers* as a further explication of those cases.

31. *Id.* at 268, 94 S.Ct. at 2773, 41 L.Ed.2d at 752.

32. *Id.*

33. *Id.* at 284, 94 S.Ct. at 2781, 41 L.Ed.2d at 761–762.

34. *Id.* at 285–286, 94 S.Ct. at 2782, 41 L.Ed.2d at 762–763.

35. 418 U.S. at 326, 94 S.Ct. at 3000, 41 L.Ed.2d at 797–798.

the opinion privilege to these statements.[36] It merely noted that "Leninist" and "Communist-fronter" are "generally considered defamatory;"[37] having decided that Gertz, as a private figure, did not have to meet the demanding *New York Times* standard of proof on the issue of malice, it remanded the case for a new trial. There was no suggestion that any of the accusations were incapable, as a matter of constitutional law, of being deemed libelous.

Similarly, in a recent statement on defamation, the Court reversed a judgment for the defendant and remanded for trial a case featuring statements that arguably could be classified as opinion. In *Hutchinson v. Proxmire*,[38] the alleged libelant, a United States Senator, had described the plaintiff's governmentally-funded animal research as "nonsense" and "transparent worthlessness."[39] Branding such use of public monies "outrageous," the Senator had added that "[i]n fact, the good doctor has made a fortune from his monkeys and in the process made a monkey out of the American taxpayer."[40] The Court ruled that these observations were not immunized by the Speech and Debate Clause, determined that the plaintiff was not a public figure, and sent the case back with no intimation that any of the allegedly libelous remarks were within the opinion privilege.

To be sure, neither *Gertz* nor *Hutchinson* expressly held that the statements at issue were *not* opinion. However, in light of the Court's willingness to reach the ultimate defamation issue rather than prolong this most sensitive type of litigation by remand,[41] I regard the dispositions in these cases as indications that the statements in each were capable of supporting a libel judgment.[42]

Rounding out the Supreme Court cases that I believe may have some bearing on the meaning of "opinion" are two decisions involving magazine articles which summarized documents susceptible of differing interpretations. *Time Inc. v. Pape*[43] was a pre-*Gertz* case with a public-figure plaintiff. Time, in the course of recapitulating a report of the Civil Rights Commission, repeated charges of police brutality by Pape in such a way as to indicate that the accusations reflected independent findings by the Commission. In actuality, the Commission's report had presented the charges as allegations in a third party's civil rights complaint.[44] The issue before the Court thus was whether Time had "engaged in a 'falsification' [of the report] sufficient in itself to sustain a jury finding of 'actual malice.'"[45] Looking to the report as a whole, the Court found "a document that bristled with ambiguities";[46] it therefore characterized Time's summary of what the

36. The Court, having announced that opinions command absolute constitutional protection, did not thereafter allude to the privilege.

37. 418 U.S. at 331 n. 4, 94 S.Ct. at 3003 n. 4, 41 L.Ed.2d at 800 n. 4.

38. 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979).

39. *Id.* at 116, 99 S.Ct. at 2678–2679, 61 L.Ed.2d at 419.

40. *Id.*

41. See, *e.g., Greenbelt Coop. Publishing Ass'n, Inc. v. Bresler, supra* note 24, 398 U.S. at 11, 90 S.Ct. at 1540, 26 L.Ed.2d at 13; *New York Times Co. v. Sullivan, supra* note 19, 376 U.S. at 284–285, 84 S.Ct. at 728–729, 11 L.Ed.2d at 709. *Cf. Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin, supra* note

25, 418 U.S. at 282, 94 S.Ct. at 2780, 41 L.Ed.2d at 760–761.

42. Perhaps also deserving of mention is the pre-*Gertz* decision in *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), where the plurality appeared willing to assume that Metromedia's characterizations of Rosenbloom's business as "the smut literature racket" and "girlie book peddlers" were capable of being deemed defamatory. See *id.* at 57, 91 S.Ct. at 1826, 29 L.Ed.2d at 319.

43. 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971).

44. *Id.* at 284–285, 91 S.Ct. at 637, 28 L.Ed.2d at 50.

45. *Id.* at 289, 91 S.Ct. at 639, 28 L.Ed.2d at 53.

46. *Id.* at 290, 91 S.Ct. at 639, 28 L.Ed.2d at 53.

document "said" as a statement of interpretation or judgment rather than one of historic fact.[47] Deeming Time's reading a plausible one, the Court held that no libel recovery was possible in such circumstances.[48] It is unclear from the *Pape* opinion, however, whether the Court reasoned that the challenged statement could not constitutionally be subjected to a post hoc evaluation of truth or falsity because it was an expression of opinion,[49] or rather that the statement was capable of being adjudged erroneous but incapable of being labeled malicious because of the reasonableness of any misinterpretation.[50]

This uncertainty about the rationale of *Pape* appears to have been resolved by *Time, Inc. v. Firestone,*[51] a post-*Gertz* case wherein a private-figure plaintiff charged Time with erroneously reporting that her husband had been granted a divorce on grounds of "extreme cruelty and adultery."[52] The divorce decree prompting the news item was hardly a model of clarity,[53] and Time, citing *Pape,* argued that a "ra-

tional interpretation of an ambiguous document is constitutionally protected."[54] The Court disagreed. It explained *Pape* as an application of the actual-malice standard,[55] thus apparently foreclosing the possibility that that decision was really an "opinion" case. Because the question of fault had not been submitted properly to the jury, the Court remanded *Firestone,* making it very clear that the jury could decide whether Time's interpretation of the divorce decree was a "false" one and impose liability if it found that Time bore the blame.[56]

### III

*Gertz'* pronouncement that the First Amendment confers an absolute privilege on expressions of opinion stands as one of the cardinal principles of free speech and press. Yet, as my brief review of pertinent Supreme Court defamation cases illustrates, it is a principle on whose implementation the Court has been virtually silent. Since *Gertz,* federal courts of appeals,[57] the highest courts of several states,[58] the American

47. *Id.* at 290–291, 91 S.Ct. at 639–640, 28 L.Ed.2d at 53.

48. *Id.* at 290–292, 91 S.Ct. at 639–640, 28 L.Ed.2d at 53–54.

49. See, *e.g., id.* at 291, 91 S.Ct. at 640, 28 L.Ed.2d at 54 ("[w]here the document reported on is so ambiguous as this one was, it is hard to imagine a test of 'truth' that would not put the publisher virtually at the mercy of the unguided discretion of a jury").

50. See, *e.g., id.* at 290, 91 S.Ct. at 639, 28 L.Ed.2d at 53 ("[t]he deliberate choice of such an interpretation, though arguably reflecting a misconception, was not enough to create a jury issue of 'malice' under *New York Times* ").

51. 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976).

52. *Id.* at 452, 96 S.Ct. at 964, 47 L.Ed.2d at 161.

53. See *id.* at 467–469, 96 S.Ct. at 971–972, 47 L.Ed.2d at 170–172 (concurring opinion).

54. *Id.* at 459 n. 4, 96 S.Ct. at 967 n. 4, 47 L.Ed.2d at 166 n. 4.

55. *Id.*

56. See *id.* at 458–459, 96 S.Ct. at 967, 47 L.Ed.2d at 165–166.

57. See, *e.g., Cianci v. New Times Publishing Co.,* 639 F.2d 54, 61–67 (2d Cir.1980); *Hotchner v. Castillo-Puche,* 551 F.2d 910, 913–914 (2d Cir.), *cert. denied,* 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977); *Buckley v. Littell,* 539 F.2d 882, 893–895 (2d Cir.1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977); *Avins v. White,* 627 F.2d 637, 642–644 (3d Cir.), *cert. denied,* 449 U.S. 982, 101 S.Ct. 398, 66 L.Ed.2d 244 (1980); *Church of Scientology v. Cazares,* 638 F.2d 1272, 1286–1289 (5th Cir. 1981); *Street v. NBC,* 645 F.2d 1227, 1232–1233 (6th Cir.1981); *Orr v. Argus-Press Co.,* 586 F.2d 1108, 1114–1115 (6th Cir.1978), *cert. denied,* 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979); *Information Control Corp. v. Genesis One Computer Corp.,* 611 F.2d 781, 783–784 (9th Cir.1980); *Dixson v. Newsweek, Inc.,* 562 F.2d 626, 631 (10th Cir.1977). These cases differ markedly in the comprehensiveness with which they treat the "opinion" issue.

58. See, *e.g., Gregory v. McDonnell Douglas Corp.,* 17 Cal.3d 596, 552 P.2d 425, 131 Cal. Rptr. 641 (1976); *National Ass'n of Gov't Employees, Inc. v. Central Broadcasting Corp.,* 379 Mass. 220, 396 N.E.2d 996 (1979), *cert. denied,* 446 U.S. 935, 100 S.Ct. 2152, 64 L.Ed.2d 788 (1980); *Rinaldi v. Holt, Rinehart & Winston, Inc.,* 42 N.Y.2d 369, 366 N.E.2d 1299, 397 N.Y. S.2d 943, *cert. denied,* 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456 (1977).

Law Institute,[59] and various commentators[60] have endeavored to ascertain just what kinds of statements are protected opinion. Cognizant of the difficulty of the undertaking, and resigned to the fact that any attempt to superimpose a categorical ordering on this infinitely variable area entails some oversimplification, I nevertheless believe that purposeful guidelines may be fashioned to inform the disposition of cases raising this issue.

I start with candid recognition that the universe of statements cannot be neatly divided, by some logically discernible equator, into hemispheres of fact and opinion. Fact is the germ of opinion, and the transition from assertion of fact to expression of opinion is a progression along a continuum. A reviewing court's charge is to determine, in light of the principles inspiring First Amendment jurisprudence and the often countervailing policies underlying common law protection of reputation and peace of mind, the point at which to draw the line

marking off that portion of speech to be accorded the absolute constitutional protection of opinion[61] rather than the conditional privilege afforded representations of fact.[62]

At one end of the continuum are statements that might, for want of a better term, be called "pure" opinion. These are expressions which commonly are regarded as incapable of being adjudged "true" or "false" in any objective sense of those terms. Matters of personal taste, aesthetics, literary criticism, religious beliefs, moral convictions, political views, and social theories would all fall within this class.[63] These are statements of the sort that might be altered by discussion[64] and whose survival as part of our society's discourse should be committed to competition in the "market" place of ideas.[65]

Also near the "pure-opinion" end of the continuum, I think, are those "loosely definable, variously interpretable,"[66] generally derogatory remarks that frequently are flung about in colloquial argument and de-

---

**59.** See Restatement (Second) of Torts § 566 and accompanying comment.

**60.** See, e.g., Carman, *Hutchinson v. Proxmire and the Neglected Fair Comment Defense: An Alternative to "Actual Malice,"* 30 DePaul L.Rev. 1 (1980); Christie, *Defamatory Opinions and the Restatement (Second) of Torts,* 75 Mich.L.Rev. 1621 (1977); Keeton, *Defamation and Freedom of the Press,* 54 Tex.L.Rev. 1221 (1976); Wade, *The Communicative Torts and the First Amendment,* 48 Miss.L.J. 671 (1977); Note, *Fact and Opinion After Gertz v. Robert Welch, Inc.: The Evolution of a Privilege,* 34 Rutgers L.Rev. 81 (1981).

**61.** *Cf. Gertz v. Robert Welch, Inc., supra* note 17, 418 U.S. 339–348, 94 S.Ct. at 3007–3011, 41 L.Ed.2d at 805–810 (balancing the needs of the First Amendment with society's concern for protection of reputation, to arrive at a standard of culpability in private-figure libel actions); *Waldbaum v. Fairchild Publications,* 201 U.S. App.D.C. 301, 305–312, 627 F.2d 1287, 1291–1298, *cert. denied,* 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980) (similar balancing, to arrive at a standard for identifying public figures).

**62.** The degree of privilege afforded false and defamatory statements of fact varies, of course, with the status of the plaintiff. Public officials and public figures can recover for defamatory factual misstatements only on clear and con-

vincing proof that the misstatement was published either with knowledge that it was false or in reckless disregard of its truth or falsity. *New York Times Co. v. Sullivan, supra* note 19, 376 U.S. at 279–280, 84 S.Ct. at 726, 11 L.Ed.2d at 706; *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 162–165, 87 S.Ct. 1975, 1995–1996, 18 L.Ed.2d 1094, 1115–1117 (1967). Private-figure plaintiffs must show at least negligence and, unless they can go further and prove actual malice, may recover only compensatory damages. *Gertz v. Robert Welch, Inc., supra* note 17, 418 U.S. 347–350, 94 S.Ct. at 3010–3012, 41 L.Ed.2d at 809–811.

**63.** *E.g., Avins v. White, supra* note 57, 627 F.2d at 640 (*inter alia,* "there is an academic ennui that pervades the institution. The intellectual spark is missing in the faculty and students."); *Loeb v. Globe Newspaper Co.,* 489 F.Supp. 481, 486 & n. 6 (D.Mass.1980) (*inter alia,* "probably the worst newspaper in America").

**64.** See *Cianci v. New Times Publishing Co., supra* note 57, 639 F.2d at 62 n. 10.

**65.** *Abrams v. United States,* 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173, 1180 (1919) (dissenting opinion).

**66.** *Buckley v. Littell, supra* note 57, 539 F.2d at 895.

bate.[67] The hallmark of these statements is not that they are innocuous or impotent, but rather that they have moved so far into the realm of vernacular epithet as to have become expressions of generalized criticism or dislike, divorced from any specific factual underpinning. Indeed, evaluating such statements as "true" or "false" is problematic largely because of the difficulty of arriving at a consensus on precisely what evidence would be relevant and sufficient to justify their use.[68]

Finally, metaphorical language is also allied to "pure" opinion. When context makes it apparent that a word is being used figuratively or imaginatively without any intention to rely on its literal meaning,[69] the labels "true" and "false" are inapposite.

All these types of statements seem clearly to fall within the ambit of the constitutional opinion privilege.[70] They would be recognized by most listeners and readers[71] as expressions of personal taste or conviction that are simply matters of opinion, or as rhetorical outlets for venting anger or contempt without imputing any specific wrongdoing, or as colorful and hyperbolic applications of language. This is not to say that publication of such statements will never be damaging to the reputation and psyche of their targets. At this end of the continuum, however, our First Amendment commitment to free circulation of ideas and beliefs—no matter how unfair, unreasonable, or unseemly they may appear to be— bars the law of defamation from assessing, according to some standard of orthodoxy, the propriety of or justification for such statements.

Expressions at or near the pure-opinion end of the continuum probably constitute only a small portion of the statements that become subjects of defamation lawsuits. Perhaps far more common, and certainly more difficult to deal with, are statements that reflect the author's deductions or evaluations but at the same time are "laden with factual content."[72] The apparent proportion of opinion to fact in these "hybrid" statements varies considerably. For example, a statement that "Jones is incompetent to handle that job" suggests some specific

**67.** *E.g., Hotchner v. Castillo-Puche, supra* note 57, 551 F.2d at 912 (*inter alia*, "toady," "hypocrite," "never open and above board"); *Loeb v. Globe Newspaper Co., supra* note 63, 489 F.Supp. at 486 & n. 6, 488 (cartoon of plaintiff showing cuckoo emerging from his forehead).

**68.** See, *e.g., Buckley v. Littell, supra* note 57, 539 F.2d at 893 (regarding "fascist", "fellow traveler", and "radical right", in their context, as statements of opinion because of the "tremendous imprecision of the meaning and usage of these terms in the realm of political debate").

**69.** *E.g.,* text *supra* at notes 24–34; *Loeb v. Globe Newspaper Co., supra* note 63, 489 F.Supp. at 486 (plaintiff "runs a paper by paranoids for paranoids").

**70.** In constructing these categories and suggesting examples, I do not mean to imply that every word or phrase can be accorded an immutable designation that applies at all times and in all circumstances. "[The] publication must be taken as a whole, and in the sense in which it would be understood by the readers to whom it was addressed." *Afro-American Publishing Co. v. Jaffe,* 125 U.S.App.D.C. 70, 76, 366 F.2d 649, 655 (1966) (*en banc*) (footnote omitted). Context plays as essential a role in determining whether a challenged statement is

fact or opinion as it does in assessing whether the statement is capable of conveying a defamatory meaning. For example, the epithet "fascist pig" flung at a police officer by an angry demonstrator presents a very different case from use of the term "fascist" in an article accusing a man of having been one of Mussolini's henchmen. In the first situation, "fascist" likely would be classed as protected opinion; in the second, it would be actionable, if culpably false, as an assertion of fact.

**71.** In deciding, as a threshold matter, whether a statement is susceptible of a defamatory meaning, the court assumes the viewpoint of the audience to which the publication was directed. *Afro-American Publishing Co. v. Jaffe, supra* note 70, 125 U.S.App.D.C. at 76, 366 F.2d at 655; *De Savitsch v. Patterson,* 81 U.S.App.D.C. 358, 360, 159 F.2d 15, 17 (1946); Restatement (Second) of Torts § 563 and accompanying comment. This same viewpoint is the appropriate perspective for determining whether a statement is a representation of fact or an expression of opinion. See *Buckley v. Littell, supra* note 57, 539 F.2d at 894; *Information Control Corp. v. Genesis One Computer Corp., supra* note 57, 611 F.2d at 784.

**72.** *Cianci v. New Times Publishing Co., supra* note 57, 639 F.2d at 63.

factual conclusion but, on the whole, seems to import a fairly high degree of subjective judgment. By contrast, a statement that "Smith is a murderer" appears much closer to an assertion of objective fact. Yet, analytically, the accusation of murder could be regarded as an opinion, for it, like the charge of incompetence, reflects a conclusion ultimately reached by the author on the basis of an amalgamation and interpretation of underlying facts.

Hybrid statements differ from pure opinion in that they are remarks which most people would regard as capable of denomination as "true" or "false," depending upon what the background facts are revealed to be. At the same time, they generally are not propositions that a scientist or logician would regard as provable "facts." The hard question is whether these kinds of statements, which both express the author's judgment and import the presence of specific facts warranting that judgment are within the absolute privilege or opinion.

When the proponent of a hybrid statement discloses to the reader all pertinent background facts completely and accurately, there is a strong argument, I believe, for including the hybrid within the realm of absolute privilege.[73] In these circumstances, the reader can recognize the hybrid as the author's synthesis and, placing it beside these predicate facts, make up his own mind about how much weight and credence to give to the author's conclusion. In effect, the background facts transform the hybrid in the eyes of the reader from a judgmental conclusion suffused with un-

specified, assumed assertions of fact into a simple statement of opinion drawn from enumerated grounds. Having supplied an accurate account of the factual background, the author cannot be said to have misled or deceived the reader about the matter discussed, even if the author's ultimate conclusion—the hybrid statement—may in some sense be erroneous. And although the author's derogatory judgment may carry some power to damage reputation simply by virtue of his status in the reader's eyes, I think it safe to posit a fairly high correlation between whatever damage is inflicted by the hybrid and the reader's personal appraisal of how justified, reasonable, or "true" that judgment is in light of the facts set forth. In these circumstances, hybrid statements would seem to pose little threat to the reputation interest safeguarded by defamation law because they can and ordinarily will be subject to rigorous and fair evaluations by fully-informed readers.[74] At the same time, their claim to First Amendment protection is great because, accompanied by full and fair presentation of pertinent background data, they share the primary immunizing characteristic of pure opinion, as the presence of accurate data ensures that the only really active element is the judgmental or interpretive component.

The problem with this balancing of First Amendment and defamation implications of hybrid statements is that it is appropriate only for the perfect case—that is, where *all* material background facts are *accurately*

---

**73.** The argument would apply equally to the case where the reader already knows, from personal observations or other sources, all the relevant background facts.

**74.** *E.g., Stuart v. Gambling Times, Inc.,* 534 F.Supp. 170, 172 (D.N.J.1982). This point can be neatly illustrated hypothetically. Author is a person who takes the extreme view that the killing of one human by another is under all circumstances murder. Author makes the following communication:

> One evening, Smith went to White's house. She had with her a small gun that she customarily carried in her purse for protection. She and White began a discussion that escalated into a heated argument. At one point,

> White, enraged, grabbed a butcher knife and lunged across the room toward Smith with the weapon raised. Smith drew out her gun, aimed it at White's heart, and pulled the trigger. White died from the wound. Smith is a murderer.

Most readers would likely consider the hybrid "Smith is a murderer" to be an irrational and thus a "false" conclusion. Presumably, their view of Smith would *not* be adversely affected by what commonly would be regarded as an unreasonable application of the charge. Because the readers possess all the relevant data, they would not be deceived by the factual implications of the word "murderer."

set forth along with the hybrid.[75] The balance shifts radically, I believe, when a hybrid appears without any recitation of the underlying facts, or when those facts are stated erroneously or incompletely. When that is the case, the reader is unable to place the author's judgment in perspective, because he either is completely ignorant of the background facts or is in some sense misled as to what they are. The false hybrid statement has the potential, then, to wreak considerable, unjustified damage to reputation.[76] A reader supplied with no background at all may well assume that there are facts which support the derogatory conclusion, particularly if it is announced by the author with apparent assurance.[77] A reader given incomplete or incorrect facts, mistakenly supposing that all pertinent data are accurately assembled before him, might give even more credence to the author's conclusion.[78] Hybrid statements unaccompanied by any predicate facts, or attended by defective recitals of the underlying facts, should thus occupy a very different position in the concerns of libel law, and their claim to First Amendment protection also is less compelling. If the background data reaching the reader are deficient, the hybrid remains as much a statement of facts as a judgment or interpretation of them.[79]

For these reasons, I would conclude that a hybrid statement may claim *absolute* privilege *as opinion*[80] only when it is accompanied by a full and accurate narration of the material background facts[81] or, if mate-

---

**75.** See *Adler v. American Standard Corp.*, 538 F.Supp. 572, 576 (D.Md.1982) ("there is a distinction between simple opinions and expressions of opinion which indicate that they are based on undisclosed facts"). See also note 73 *supra.*

**76.** This has long been recognized:

To state accurately what a man has done, and then to say that in your opinion such conduct is disgraceful or dishonorable, is comment which may do no harm, as every one can judge for himself whether the opinion expressed is well founded or not. Misdescription of conduct, on the other hand, only leads to the one conclusion detrimental to the person whose conduct is misdescribed, and leaves the reader no opportunity for judging himself for [*sic*] the character of the conduct condemned, nothing but a false picture being presented for judgment.

*Christie v. Robertson,* 10 New S.Wales L.Rep. 157, quoted in *De Savitsch v. Patterson, supra* note 71, 81 U.S.App.D.C. at 360, 159 F.2d at 17.

**77.** Consider, for example, a variation on the hypothetical in note 74 *supra.* This time Author makes simply the unelaborated statement "Smith is a murderer" to persons with no knowledge of the underlying circumstances. The average reader is unlikely to even consider the possibility that Author entertains a bizarre conception of "murder" which fails to distinguish between unjustified intentional killing and self-defense. Accordingly, the reader is apt to assume the existence of some factual predicate warranting, according to common understanding, use of the charge "murderer"—particularly if Author were someone who appeared to be in a position to know about the incident.

**78.** In one more variation on the hypothetical, consider the case where Author recites the story of Smith's encounter with White *except* that he omits the sentence describing how White came at Smith with a knife. In this event, the statement "Smith is a murderer" is probably both the most damaging to Smith's reputation and the most deceptive of all the hypothetical hybrids because it is accompanied by an apparently complete set of facts which, on their face, justify its use. I assume that neither the damage nor the deception is significantly lessened if Author had said instead "I think Smith is a murderer." The problem is not with the reader's ability to recognize that this is Author's conclusion, but rather with an inability to separate out, and dismiss as erroneously suggested, the factual component of the charge "murderer" in these circumstances.

**79.** Although "[t]he First Amendment requires that we protect some falsehood in order to protect speech that matters," *Gertz v. Robert Welch, Inc., supra* note 17, 418 U.S. at 341, 94 S.Ct. at 3007, 41 L.Ed.2d at 806, "there is no constitutional value in false statements of facts." *Id.* at 340, 94 S.Ct. at 3007, 41 L.Ed.2d at 805.

**80.** The hybrid is, of course, always entitled to at least the qualified privilege the First Amendment accords factual statements. See note 62 *supra* and text accompanying note 82 *infra.* My concern in this case is to determine when a hybrid will receive the quantum of additional protection afforded by the opinion privilege.

**81.** I also would accept the claim of absolute privilege for hybrid statements unaccompanied by predicate facts when made to readers who

rial data are omitted or erroneous, when the factual omission or error is not traceable to actual malice in the case of a public figure, or, in the case of a private figure, to whatever degree of culpability has been adopted by the relevant state's defamation law.[82] This approach, I believe, is dictated by the need to account adequately for the factual load carried by the hybrid statement. If the author of the hybrid presents it alongside a recital of material predicate facts that is accurate and complete, or, if inaccurate or incomplete, satisfies the duty of care he must meet in making factual representations, the ultimate judgment or interpretation he announces through the hybrid should be immune from liability, no matter how unreasonable, intemperate, or spiteful it may be. If the author culpably fails to provide the requisite background, then the

hybrid should be held to forfeit all claim to absolute privilege and be afforded only that quantum of protection accorded a purely factual misstatement in the circumstances.[83]

To recapitulate, I think the absolute First Amendment opinion privilege proclaimed in *Gertz* should be held to shield four categories of statements. The first includes expressions of personal taste, sentiment, and values that are essentially and inherently subjective in nature. In the second group are those general derogatory epithets and "undefined slogans"[84] flung about in the course of political, economic, and social debate that express contempt or extreme disagreement without connoting any particular factual basis. Third is language which, from its context, obviously is used in the figurative or hyperbolic sense. These three

already have all pertinent background data, see note 73 *supra* and accompanying text, anticipating, however, that instances of this sort will be relatively few.

**82.** The author's recitation of background data may, of course, be defective for any of a variety of reasons. These run the gamut from a completely innocent and excusable ignorance of key facts to a deliberate and malicious withholding of relevant material. In between are errors and omissions attributable to varying degrees of negligence and recklessness. Instead of holding that a failure to supply complete and accurate predicate data automatically disentitles the author from claiming the opinion privilege for his hybrid statement, I believe that First Amendment considerations require taking account of the author's culpability for deficiencies in the factual presentation. I therefore would adopt by analogy the standards of care developed in *New York Times* and *Gertz*. See note 62 *supra*. Thus, when the plaintiff claiming libel is a public official or public figure, the pertinent inquiry should be whether the author's failure to provide full and correct background data is traceable to actual malice. When a private-figure plaintiff is involved, the critical question should be whether at minimum the author was negligent in setting out the material factual bases for the hybrid. If the error or omission in the recital of predicate data is found nonculpable under the relevant standard, the hybrid, though false, should then be absolutely privileged as opinion even though it may mislead the reader and damage the victim's reputation. These degrees of protection are necessary, I think, for the same prophylactic purposes that they are needed when purely factual assertions are involved. I see no consti-

tutional imperative, however, to extend the absolute privilege to false hybrids in cases where the author culpably fails to provide full and accurate material background data.

**83.** The position I have advanced is similar to that taken by the American Law Institute in the Restatement (Second) of Torts. See § 566 and illustrations 3 & 4. It is not clear, however, whether the Restatement imposes, as I think proper, a condition that the underlying facts be *fully* reported before absolute privilege can be claimed. Appellees have argued that all that is required to trigger the privilege is disclosure of *some* of the underlying factual basis for the hybrid statement; if this is the import of the Restatement, I must respectfully express my disagreement. Were that the rule, one could (1) truthfully set out the facts that Smith went to White's house, quarreled, took out a gun and intentionally shot White; (2) deliberately and maliciously omit the fact that White attacked first with a knife; (3) announce the conclusion that Smith is a murderer; and (4) claim that the communication is absolutely privileged because the facts which *were* reported were accurate and the hybrid was accompanied by *some* factual basis. As this court has said in a slightly different context, "[p]artial truths are not necessarily even mitigating in this branch of the law, for the defamer may be the more successful when he baits the hook with truth." *Afro-American Publishing Co. v. Jaffe, supra* note 70, 125 U.S.App.D.C. at 76, 366 F.2d at 655. See note 76 *supra*.

**84.** *Cafeteria Employees Union v. Angelos*, 320 U.S. 293, 295, 64 S.Ct. 126, 127, 88 L.Ed. 58, 60 (1943).

types are characterized by the absence of any suggestion that they are grounded in a specific factual predicate, and I have located them near the "pure opinion" end of the continuum. The fourth category embraces statements, which I have termed "hybrids," that both intimate the existence of specific facts, and convey the author's ultimate judgment or interpretation of those facts, *provided that* such statements are accompanied by a full and accurate account of the material background facts, or that incompleteness or inaccuracy of the predicate data is nonculpable according to the applicable standard of care.

I do not mean to imply that I perceive my delineation of the scope of the opinion privilege to be clearly mandated by any of the Supreme Court's defamation decisions. I believe, however, that it is responsive to, and certainly not inconsistent with, what little can be gleaned from them. For example, *Greenbelt* and *Letter Carriers* are, by their own terms, instances of protection accorded language used figuratively or hyperbolically.[85] In *Hutchinson*,[86] where the challenged press release called the plaintiff's research "transparent worthlessness" and remarked that he was personally profiting from a pointless expenditure of tax monies, the plaintiff claimed that the release "contained an inaccurate and incomplete summary of his research."[87] Hence, if the allegedly libelous comments in that case are viewed as hybrids, issue squarely had been joined on whether a full and fair account of the factual predicate had been provided. The report of the content of the divorce decree in *Firestone*[88] was not the

kind of literary criticism that would be absolutely privileged as a subjective expression of "pure" opinion; if in the realm of opinion at all, the report was at best a hybrid presented with no background data whatever.[89] Thus, the dispositions in those cases are not at odds with my view on the scope of the opinion privilege.

## IV

I now turn my attention to the passages of the syndicated column which are subjects of complaint in the case at bar. I agree with the District Court that Evans' and Novak's characterization of Ollman as an "outspoken proponent of 'political Marxism' "[90] is absolutely privileged. It falls well within the class of "loosely definable, variously interpretable statements of opinion ... made inextricably in the contest of political, social or philosophical debate...."[91] "Political Marxism" is much too ambiguous a slogan to permit a court to determine whether it is really defamatory, much less to ascertain whether the claim that Ollman propounds it is actually false.[92]

Presenting a very different problem, however, is the column's observation that

> [w]hile Ollman is described in news accounts as a "respected Marxist scholar," he is widely viewed in his profession as a political activist.[93]

Like "political Marxism," the term "political activist" would not normally be deemed defamatory.[94] As it appears here, however, it reasonably could be read as implying the antithesis of scholarship.[95] This interpreta-

---

**85.** See text *supra* at notes 24–34.

**86.** See text *supra* at notes 38–41.

**87.** 443 U.S. at 116, 99 S.Ct. at 2678, 61 L.Ed.2d at 419.

**88.** See text *supra* at notes 51–56.

**89.** See 424 U.S. at 452, 96 S.Ct. at 964, 47 L.Ed.2d at 161–162 (reprint of the entire paragraph complained of).

**90.** See Appendix, *infra*, ¶ 5.

**91.** *Buckley v. Littell, supra* note 57, 539 F.2d at 895.

**92.** This is not a case wherein the author has defined the critical terminology in the statement so as to impart a precise meaning in the particular context.

**93.** See Appendix, *infra*, ¶ 5.

**94.** Nor, for that matter, is it very precise.

**95.** A term not libelous when standing alone may be defamatory in a context in which it has a damaging connotation. See, *e.g., De Savitsch v. Patterson, supra* note 70, 81 U.S.App.D.C. at 359, 159 F.2d at 16.

tion is reinforced by the authors' later comments:

> Such pamphleteering is hooted at by one political scientist in a major eastern university, whose scholarship and reputation as a liberal are well known. *"Ollman has no status within the profession, but is a pure and simple activist,"* he said.[96]

The District Court characterized these statements as the authors' submission "that [Ollman] lacks a reputation in his field as a scholar." [97] I agree that a jury reasonably could find [98] the overall import of the remarks to be that, although Ollman has been described in the press as a respected scholar, his professorial colleagues actually do not regard him as such. Without doubt, scholarship is the quintessential attribute of professional competence. To say that a professor's academic peers, who presumably are those most capable of evaluating the real merit of his work, do not rate him highly as a scholar is to impugn his professional reputation severely.

A statement that Ollman's peers do not respect him as a scholar stands, I submit, on quite different footing from a statement that Evans and Novak do not themselves rank him as one. The latter might well fall into the category of "pure" opinion, as a subjective appraisal of the value of Ollman's writings.[99] The *former*, however, if not actually a representation of fact,[100] certainly rises no higher than a hybrid statement. It may convey the authors' ultimate assessment of what the political science profession thinks of Ollman, but it also implies the existence of facts inducing that conclusion—such as evaluations of Ollman's work by a sampling of academics, critical reviews of his articles, or a poll taken of members of the profession—and there is little sign of any such factual predicate in the column in suit. Our attention is directed to a passage describing how Ollman came in last in two American Political Science Association elections,[101] but just what this fact has to do with Ollman's scholarly reputation in the profession is not immediately apparent to me; indeed, the article itself professes some

**96.** See Appendix, *infra*, ¶ 11 (emphasis added). Authors are not, of course, insulated from liability by virtue of the fact that they merely repeat what another purportedly said. "The law affords no protection to those who couch their libel in the form of reports or repetition." *Olinger v. American Savs. & Loan Ass'n,* 133 U.S.App.D.C. 107, 109, 409 F.2d 142, 144 (1969). *Accord, Pittsburgh Courier Publishing Co. v. Lubore,* 91 U.S.App.D.C. 311, 312, 200 F.2d 355, 356 (1952); *Cianci v. New Times Publishing Co., supra* note 57, 639 F.2d at 60–61; *Dixson v. Newsweek, Inc., supra* note 57, 562 F.2d at 630–631.

**97.** *Ollman v. Evans, supra* note 1, 479 F.Supp. at 294.

**98.** The threshold determination on whether a statement is capable of bearing a defamatory meaning is for the court; the ultimate conclusion on whether such a meaning was indeed conveyed is for the jury. *Olinger v. American Savs. & Loan Ass'n, supra* note 96, 133 U.S. App.D.C. at 109, 409 F.2d at 144. *Accord, Cianci v. New Times Publishing Co., supra* note 57, 639 F.2d at 60; *Avins v. White, supra* note 57, 627 F.2d at 644; *Church of Scientology v. Cazares, supra* note 57, 638 F.2d at 1286.

**99.** In similar vein, I consider Evans' and Novak's characterization of Ollman's book, *Alienation: Marx's Conception of Man in Capitalist*

*Society,* as a "ponderous tome" and "pamphleteering," see Appendix, *infra*, ¶¶ 10 & 11, to be an obviously subjective judgment within the realm of pure opinion.

**100.** There is some reason for treating the statement as a factual representation. It purports categorically to announce what a finite set of people—political scientists—think about a given subject—Ollman's scholarship. In theory at least, the truth or falsity of this representation could be established empirically by polling each member of the group and tabulating the results. That each of the answers is in itself the respondent's opinion does not make the summary of how many people gave which answer any less a statement of fact. I recognize, however, that the opinion of a large group on a given subject often cannot, for logistical reasons, be obtained through a universal poll. In such cases, the would-be reporter of opinion must extrapolate from a sample survey or from other data. For this reason, I take it that the statements at issue reflect in some degree elements of judgment and interpretation. By no means, however, do I accept the suggestion that they represent pure opinion.

**101.** See Appendix, *infra*, ¶ 6.

uncertainty about "[w]hether or not [the election results] represent [ ] a professional judgment by his colleagues."[102] Ollman, on the other hand, points to a 1978 published survey in which, so he claims, "a poll of 317 leading and representative political scientists" ranked him "10th in the entire field of all political scientists in terms of occupational prestige."[103] I thus think that, although the matter is not wholly free from doubt, the sparsity of supporting facts in the column, coupled with the survey Ollman proffers, raises a genuine issue as to whether there was a culpable omission or error in the background facts presented to the reader.[104]

I come finally to a set of statements relating to Ollman's writings and to what assertedly they reveal about his objectives as an instructor:

> His candid writings avow his desire to use the classroom as an instrument for preparing what he calls "the revolution."

> \*   \*   \*   \*   \*   \*

> Ollman's intentions become explicit in "On Teaching Marxism and Building the Movement," his article in the Winter 1978 issue of New Political Science. Most students, he claims, conclude his course with a "Marxist outlook." Ollman concedes that will be seen "as an admission that the purpose of my course is to convert students to socialism."

> That bothers him not at all because "a correct understanding of Marxism (as indeed of any body of scientific truths) leads automatically to its acceptance." Non-Marxist students are defined as those "who do not yet understand Marxism." The "classroom" is a place where the student's "bourgeois ideology is being dismantled." "Our prior task" before the revolution, he writes, "is to make more revolutionaries. The revolution will only occur when there are enough of us to make it."[105]

I would note initially that these excerpts do not represent literary, scholarly, or ideological criticism. They do not advance the authors' personal views of such attributes as Ollman's writing style, the quality of his analysis, or the value or correctness of the ideas he advances. While comments of this type, I assume, would be the kind of pure opinion that lies at the core of the opinion privilege,[106] the quoted passages purport to describe the substantive content of Ollman's article. A jury reasonably could read these passages as saying that Ollman, in his writings, openly admits that he wishes to use the classroom to indoctrinate his students and transform them into Marxists.[107] To be sure, whenever an author undertakes to encapsulate and describe the contents of another's lengthy work, the product is apt to reflect some amount of the author's own interpretation and judgment. Here, however, a significant component of factual representation also comes through, particularly in such strong and apparently unequivocal phrases as "[h]is candid writings avow," "Ollman's intentions become explic-

---

**102.** *Id.* Evans and Novak here argue that "[r]unning for office is an act of political activism...." Brief for Appellees at 23. That, of course, misses the point. The issue is not whether Ollman is indeed an activist of any sort, but whether his professional colleagues *regard* him as a "political activist" as opposed—according to the antithesis set up in the column—to a "respected Marxist scholar."

**103.** Letter from Isidore Silver, counsel for Ollman, to Evans and Novak demanding retraction, appended to Complaint, *supra* note 3, as Exhibit B, J.App. 12.

**104.** In view of its disposition of the entire case on the ground of the opinion privilege, the District Court did not reach the question whether Ollman is a public figure. See generally *Waldbaum v. Fairchild Publications, supra* note 61.

**105.** See Appendix, *infra,* ¶¶ 3, 7, 8.

**106.** See note 99 *supra.*

**107.** I accept Ollman's view that a suggestion that a teacher uses his classroom, not for the impartial educational goal of advancing his students' intellectual progress, but for the partisan purpose of recruiting them to his personal political creed is a damaging one that implies a perversion of the academic mission. To say falsely that a professor admits to such a purpose could well be found defamatory.

it" and "Ollman concedes."[108] I therefore think these passages should properly be regarded as hybrid statements of what Ollman's writings say about his intentions in the classroom.[109]

A fair amount of background material on this point is provided in the column under attack, largely in the form of direct quotations from Ollman's writings. There is some question, however, as to the completeness and accuracy with which these predicate facts are set out. The District Court, after a careful review, found that "[w]hile [Evans and Novak] refer to [Ollman's] writings and speeches, Ollman's statements are selected to reflect [their] opinion. Portions contrary to Evans' and Novak's viewpoint are carefully omitted."[110] The court also suggested that "this may be thought of as biased journalism,"[111] and an examination of the full text of the sources quoted could lead one to believe that this appellation may not be undeserved.[112] I conclude, then, that these passages also present a genuine issue whether the absolute privilege for opinion has been forfeited by culpable omissions or errors in the supporting facts which the article offered its readers.

## APPENDIX

## THE MARXIST PROFESSOR'S INTENTIONS

What is in danger of becoming a frivolous public debate over the appointment of a Marxist to head the University of Maryland's department of politics and government has so far ignored this unspoken concern within the academic community: the avowed desire of many political activists to use higher education for indoctrination.

The proposal to name Bertell Ollman, professor at New York University, as department head has generated wrong-headed debate. Politicians who jumped in to oppose Ollman simply for his Marxist philosophy have received a justifiable going-over from defenders of academic freedom in the press and the university. Academic Prince

---

108. See Appendix, infra, ¶¶ 3, 7.

109. Indeed, the opening paragraph of Evans' and Novak's column identifies this as its principal theme:

> What is in danger of becoming a frivolous public debate over the appointment of a Marxist to head the University of Maryland's department of politics and government has so far ignored this unspoken concern within the academic community: *the avowed desire of many political activists* to use higher education for indoctrination.

Appendix, infra, ¶ 1 (emphasis added). As noted earlier, see text *supra* at note 93, Ollman is subsequently identified in the column as someone whom his colleagues regard as a "political activist."

110. *Ollman v. Evans, supra* note 1, 479 F.Supp. at 294.

111. *Id.*

112. For example, the opening paragraphs of Ollman's article, from which several quotations were taken, read in full:

> What are the practical results of my course on Marxism? How can one judge them? Most students who answer the question, "Why are you or aren't you a Marxist?", indicate at the end of the course that they now accept Marx's analysis (although the

majority are still wary of the label "Marxist"). Where this happens, these students know better than most comrades with whom I have talked when and how they adopted a Marxist outlook. For most, the break with bourgeois ideology seems to have taken place behind their backs, so that at one moment they considered themselves liberals (or worse), and then a little later—without quite noticing the transition—they considered themselves socialists.

> If non-Marxists see my concern with such questions as an admission that the purpose of my course is to convert students to socialism, I can only answer that in my view—a view which denies the fact/value distinction—a correct understanding of Marxism (as indeed of any body of scientific truths) leads automatically to its acceptance. I hasten to add that this is not reflected in my grading practices; non-Marxist students (i.e., students who do not yet understand Marxism) do at least as well as the rest of the class given by bourgeois professors. [*sic*] Furthermore, I do not consider that I introduce more "politics" into my course than do other social science professors, or that I am any more interested than they are in convincing students of the correctness of my interpretations.

Ollman, *On Teaching Marxism and Building the Movement,* New Political Science (Winter 1978), Supp.App. at 5.

Valiants seem arrayed against McCarthyite know-nothings.

But neither side approaches the central question: not Ollman's beliefs, but his intentions. His candid writings avow his desire to use the classroom as an instrument for preparing what he calls "the revolution." Whether this is a form of indoctrination that could transform the real function of a university and transcend limits of academic freedom is a concern to academicians who are neither McCarthyite nor know-nothing.

To protect academic freedom, that question should be posed not by politicians but by professors. But professors throughout the country troubled by the nomination, clearly a minority, dare not say a word in today's campus climate.

While Ollman is described in news accounts as a "respected Marxist scholar," he is widely viewed in his profession as a political activist. Amid the increasingly popular Marxist movement in university life, he is distinct from philosophical Marxists. Rather, he is an outspoken proponent of "political Marxism."

He twice sought election to the council of the American Political Science Association as a candidate of the "Caucus for a New Political Science" and finished last out of 16 candidates each time. Whether or not that represents a professional judgment by his colleagues, as some critics contend, the verdict clearly rejected his campaign pledge: "If elected ... I shall use every means at my disposal to promote the study of Marxism and Marxist approaches to politics throughout the profession."

Ollman's intentions become explicit in "On Teaching Marxism and Building the Movement," his article in the Winter 1978 issue of New Political Science. Most students, he claims, conclude his course with a "Marxist outlook." Ollman concedes that will be seen "as an admission that the purpose of my course is to convert students to socialism."

That bothers him not at all because "a correct understanding of Marxism (as indeed of any body of scientific truths) leads automatically to its acceptance." Non-Marxist students are defined as those "who do not yet understand Marxism." The "classroom" is a place where the students' "bourgeois ideology is being dismantled." "Our prior task" before the revolution, he writes, "is to make more revolutionaries. The revolution will only occur when there are enough of us to make it."

He concludes by stressing the importance to "the movement" of "radical professors." If approved for his new post, Ollman will have a major voice in filling a new professorship promised him. A leading prospect is fellow Marxist Alan Wolfe; he is notorious for his book "The Seamy Side of Democracy," whose celebration of communist China extols the beneficial nature of "brainwashing."

Ollman's principal scholarly work, "Alienation: Marx's Conception of Man in Capitalist Society," is a ponderous tome in adoration of the master (Marxism "is like a magnificently rich tapestry"). Published in 1971, it does not abandon hope for the revolution forecast by Karl Marx in 1848. "The present youth rebellion," he writes, by "helping to change the workers of tomorrow" will, along with other factors, make possible "a socialist revolution."

Such pamphleteering is hooted at by one political scientist in a major eastern university, whose scholarship and reputation as a liberal are well known. "Ollman has no status within the profession, but is a pure and simple activist," he said. Would he say that publicly? "No chance of it. Our academic culture does not permit the raising of such questions."

"Such questions" would include these: What is the true measurement of Ollman's scholarship? Does he intend to use the classroom for indoctrination? Will he indeed be followed by other Marxist professors? Could the department in time be closed to non-Marxists, following the tendency at several English universities?

Even if "such questions" cannot be raised by the faculty, they certainly should not be raised by politicians. While dissatisfaction

with pragmatism by many liberal professors has renewed interest in the comprehensive dogma of the Marxists, there is little tolerance for confronting the value of that dogma. Here are the makings of a crisis that, to protect its integrity and true academic freedom, academia itself must resolve.

WALD, Circuit Judge, concurring in the judgment.

I concur in the remand because I believe the statements singled out in Chief Judge Robinson's opinion as "hybrid" are properly classified as factual statements, not opinion and thus subject to challenge as libelous. While creation of a hybrid fact-opinion classification is intriguing, on balance I believe making hard judgments in each case as to whether a statement is opinion or fact will in the long run make the law of libel easier to understand and comply with. Specifically, I am concerned that courts not have to decide whether the author has backed a hybrid statement with a "full and accurate account of the material background facts"; that sounds too much like an exercise of editorial judgment. In addition, I predict that since hybrid statements will enjoy a privileged status as opinions only if all pertinent background facts are stated completely and accurately or the requisite standard of care is met, the vast majority of such statements ultimately will be treated and tested as facts anyway.

MacKINNON, Senior Circuit Judge, concurring in the judgment:

I differ substantially from Chief Judge Robinson's analysis but do not oppose the remand to give the district court an opportunity to consider the points raised in his opinion. In my judgment the article, considered as a whole, is privileged opinion. It is well established that in evaluating the meaning of an allegedly defamatory statement its words are to be construed in their context and not in isolation.[1] In my opinion the content of the nationally syndicated article in this case should be judged in its entirety and not in disjointed fragments. Furthermore, I would give more consideration to the circumstances under which the statement was published.[2] On remand, the district court should keep these fundamental principles in mind in determining "whether the absolute privilege for opinion has been forfeited by culpable omissions or errors in the supporting facts which the [Evans and Novak] article offered its readers." Opinion of Robinson, C.J., at 33.

If, as I suspect and as is customary, the article appeared on the opinion-editorial page, generally known in the trade as the op-ed page, that circumstance would be *very* relevant to the district court's determination. Newspaper readers are likely to assume that articles appearing on the op-ed page, especially nationally syndicated editorial comments, in contrast to news articles which traditionally appear elsewhere in the newspaper, are intended to express specific opinions. It is also customary for the newspaper to limit the space available for syndicated columnists to express their editorial opinions. This requires that their views be presented in very condensed form. The primary focus of such articles is *opinion* and they are generally so understood. Under these circumstances, *readers of the opinions* of nationally syndicated columnists are less likely to be misled by the omission of some facts that persons named in such articles might consider to be necessary. I do not understand Chief Judge Robinson's opinion to foreclose the district court's consideration of such circumstances in assessing the availability of the privilege for opinion in this case.[3]

1. *Cianci v. New Times Publishing Co.*, 639 F.2d 54, 60 (2d Cir.1980); *Afro-American Publishing Co. v. Jaffe*, 366 F.2d 649, 655 (D.C.Cir.1966) (en banc); Restatement (Second) of Torts § 563 comment d (1977).

2. *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 285–86,

94 S.Ct. 2770, 2782, 41 L.Ed.2d 745 (1974); *Greenbelt Cooperative Publishing Ass'n v. Bresler*, 398 U.S. 6, 13–14, 90 S.Ct. 1537, 1541, 26 L.Ed.2d 6 (1970); Restatement (Second) of Torts § 563 comment e (1977).

3. Opinion of Robinson, C.J., at 17 n. 70.